810 A.2d 1109 (2002)
355 N.J. Super. 482
Calvin TAYLOR, Plaintiff-Appellant,
v.
INTERNATIONAL MAYTEX TANK TERMINAL CORPORATIONBayonne, Michael Koscelnak, Richard Fisette, Kent Hoffman, John Does 1-10 (said names being fictitious and presently unknown), and X corporation (said corporation being fictitious and presently unknown), Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 2002.
Decided December 5, 2002.
*1111 Neal M. Unger, Edison, argued the cause for appellant (Mr. Unger and Thoreau F. Clark, on the brief).
Ronald H. DeMaria, Newark, argued the cause for respondents (McElroy, Deutsch & Mulvaney, attorneys; Mr. DeMaria, on the brief).
Before Judges PETRELLA, LINTNER and BILDER.
*1110 The opinion of the court was delivered by LINTNER, J.A.D.
These two cases, which we consolidate for the purposes of this opinion, arise from an order for partial summary judgment barring plaintiff from receiving any damages, including compensatory and punitive damages, on any of his claims from March 14, 1997 forward, and a consent order dismissing plaintiff's remaining claims with prejudice followed by an order dismissing a subsequently filed complaint seeking additional but similar damages.
On May 11, 1999, plaintiff, Calvin Taylor, filed a complaint seeking compensatory damages for emotional distress, humiliation and embarrassment, and economic loss, as well as punitive damages and attorneys fees. The complaint alleged that his employer, International Maytex Tank Terminal Corporation-Bayonne (IMTT), and certain named and unnamed supervisors violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, by: (1) subjecting him to unfair racially oriented treatment; (2) creating a hostile *1112 work environment; and (3) failing to promote him and pay him on an equal footing with others "who were not members of the black race." The complaint also alleged that defendants violated his implied employment contract and covenant of good faith and fair dealing by failing to promote and pay him in a manner consistent with similarly situated non-black employees. Finally, the complaint alleged that defendants made false, defamatory and misleading statements concerning plaintiff's personal, professional and business reputation, and intentionally and negligently caused plaintiff emotional distress. Defendants answered and, after almost two years of discovery, moved for partial summary judgment as to damages.
On June 8, 2001, the Law Division judge filed a written opinion barring plaintiff from seeking at the time of trial "any economic recovery" and damages for reinstatement from March 14, 1997 forward. On the same date, the judge signed an order barring plaintiff from being awarded "any damages for front pay, back pay, lost wages, fringe benefits, punitive or compensatory damages or any other legal or equitable damages" from March 14, 1997 forward. On August 3, 2001, the judge denied plaintiff's motion for reconsideration and, in the alternative, to certify the June 8 order as final. Prior to trial, the parties entered a Consent Order of Dismissal, which was approved by the motion judge on September 5, 2001. Plaintiff filed his notice of appeal on October 2, 2001.
Meanwhile, on June 28, 2001, plaintiff filed a second action that, except for the allegation that defendants discriminated against him in retaliation for filing his first complaint, sought similar damages and alleged essentially the same acts of discrimination, negligence, defamation, and breach of contract that had been asserted in his earlier complaint. Another Law Division judge granted defendants' motion on January 11, 2002, dismissing plaintiff's second complaint with prejudice based on the entire controversy doctrine. Plaintiff appealed the dismissal of his second complaint on February 22, 2002.
We agree with the motion judge's opinion barring plaintiff from seeking "economic" damages, namely damages for front pay, back pay, lost wages, fringe benefits, and losses incidental to alleged demotion or lost opportunity for promotion, from March 14, 1997 forward. However, we modify the order of June 8, 2001, to comport with the judge's written opinion and remand plaintiff's claims for non-economic and punitive damages for further proceedings. Because plaintiff's punitive and non-economic damage claims remain viable, plaintiff's appeal of the order dismissing the second complaint, to the extent that it sought punitive and non-economic damages, is moot. We, therefore, set aside the January 11, 2002 order and remand for further proceedings.
We restate the relevant facts. IMTT operates a liquid bulk storage facility in the City of Bayonne on approximately 550 acres. The site has about 640 storage tanks, some of which contain hazardous materials. Plaintiff began working for IMTT in April 1993, attaining the position of Assistant Shift Supervisor by February 1997. On February 21 of that year, plaintiff, his shift supervisor, Tim Shaffery, and maintenance supervisor, Lynne Parry, were asked to check two pumps after a problem was reported. On February 26, 1997, IMTT discovered that tank 5214 overflowed, resulting in a spill of approximately 19,200 gallons of methyl tertiary butyl ether (MTBE), a highly toxic gasoline additive. The spill prompted a response from the Bayonne fire department, a hazardous materials unit, and a mobile decontamination unit, and was formally reported *1113 to the State Department of Environmental Protection. A preliminary investigation discovered that the 504 valve had been left "wide open," thus precipitating the spill. The clean-up cost for the spill was approximately $300,000.
The morning after the spill, IMTT's Operations Manager, Albert Parlato, met with plaintiff, Shaffery and Assistant Operations Manager Bill Seitter. Parlato asked plaintiff and Shaffery whether the pump test they conducted the previous Friday could have had anything to do with valve 504 being left open. After checking the log book, both plaintiff and Shaffery responded that they were certain they did not use the 504 valve for the pump test. Plaintiff later advised Seitter that he and Shaffery went back to tank 5214 to retrace their steps and that they were positive they did not use valve 504 during the pump test.
Despite their denials, Parlato concluded the following in a letter sent to plaintiff on March 14, 1997:
I am convinced by all the information at hand that the 504 valve was left open by you and Timmy when you performed the pump test on February 21, 1997, even though you claim you did not use the 504 line/valve. I can only hope that you really don't remember with any certainty due to the lapse in time.
Parlato further advised plaintiff that he was suspended for four days without pay and demoted to the position of Audit Gauger with a corresponding decrease in salary from $46,150 to $38,000.
In July 1997, Dennis Barbarise, Director of Administration and second in command at IMTT, called plaintiff into his office to ask about his involvement in the February spill. Plaintiff admitted that "in doing the pump test of tank 5214 on February 21, 1997, [he] unintentionally and inadvertently failed to check the position of the # 504 valve." Shortly after this conversation, Barbarise promoted plaintiff to the position of Maintenance Supervisor.
On October 5, 1999, plaintiff left IMTT, claiming he could no longer tolerate the racially hostile work environment. On December 22, 1999, plaintiff admitted at his deposition that he and Shaffery had left the 504 valve open during the pump test and agreed to lie about their involvement in the subsequent overflow:
Q. [I]s there a reason why Mr. Parlato didn't know what you've told me here today, namely, you did use [valve 504], both you and Tim [Shaffery]?
A. I was told not to tell him.
Q. By whom?
A. By Tim Shaffery.
Q. Was anyone present when he told you to do that?
A. No.
Q. Just the two of you?
A. Yes.
Q. Okay. What reason did he give you
A. He told me
Q. for, basically, lying?
A. He told me Honesty is not the best policy, just tell him that this is what happened and that's it.
Q. Okay. And that was the game plan that the two of you
A. Yes, it is.
Q. decided to implement?
A. Yes, it is.
On January 14, 2000, IMTT representatives confronted Shaffery with plaintiff's admission. Shaffery corroborated plaintiff's account, except he alleged that the cover-up was plaintiff's idea. Shaffery was terminated from IMTT, effective January 14, 2000, for lying during the investigation. On that same date, defendant Richard Fisette, IMTT's Terminal Manager, sent plaintiff a letter informing him of Shaffery's *1114 fate and that "[i]f I knew during the investigation that you both lied about the incident, you both would have been immediately terminated."
Defendants filed their motion for partial summary judgment, contending that plaintiff should be barred from seeking damages for defendants' alleged acts of discrimination occurring after March 14, 1997, the date IMTT should have learned of plaintiff's misconduct and would have terminated plaintiff had it known. In response, plaintiff maintained Shaffery had coerced him into participating in the cover-up by saying "remember I do your review."
Setting forth that plaintiff wanted to voluntarily withdraw all remaining claims and appeal the order for partial summary judgment because it "precluded plaintiff from seeking recovery on substantially all of his claims," the parties entered into the consent order dismissing all of plaintiff's claims with prejudice for the period of time subsequent to March 14, 1997. The consent order further provided that if plaintiff was successful on appeal he would be permitted to pursue any viable claims dismissed by the order.
Against this factual background we first consider plaintiff's contention that the motion judge erroneously granted partial summary judgment in favor of defendants. Plaintiff first contends that the judge erred because there was a genuine issue of material fact whether his wrongdoing was of such severity that IMTT would have terminated him had it known of it at the time the misconduct occurred. See McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 362-63, 115 S.Ct. 879, 886-87, 130 L.Ed.2d 852, 864 (1995). He asserts, as he did before the motion judge, that IMTT had an opportunity to fire him in July 1997 when he admitted that he had inadvertently failed to check the position of the 504 valve but it instead opted not to pursue the matter further and to promote him. He maintains that the company's actions represent "contradictory evidence" that it did not know of plaintiff's involvement in the cover-up until his deposition was taken, thus establishing an issue of fact precluding summary judgment. Plaintiff's arguments are unpersuasive.
The motion judge aptly noted in his written opinion that "[c]onspicuously missing from [plaintiff's contention] is any reference to the agreement with [Shaffery] to deliberately misrepresent their involvement in leaving valve 504 in an open position, thereby causing the overflow from tank 5214." We agree with this observation. Plaintiff did not tell IMTT's Director of Administration that he and his fellow employee participated in a scheme to cover up their involvement in the spill. His statement only confirmed what had already been concluded by the investigation, i.e., that he had merely forgotten to close the valve. The company's actions toward plaintiff after his acknowledgment of inadvertence do not contradict IMTT's contention that it had no knowledge of the cover-up until plaintiff's deposition was taken.
Plaintiff's claim in his affidavit submitted in opposition to defendants' motion that he felt coerced by Shaffery to participate in the cover-up, is equally unavailing. Again, the motion judge correctly pointed out that plaintiff had every opportunity to mention coercion on the part of Shaffery at his deposition, but instead testified that Shaffery told him that honesty was not the best policy and they mutually agreed to implement the cover-up. In reasoning that there was no genuine issue of material fact that the company would have fired plaintiff had it known the truth, the motion judge pointed out:
The 1997 chemical spill was a serious environmental accident. By all accounts, the City of Bayonne's public *1115 safety resources were mobilized and responded to a full blown emergency with the potential of far reaching public health consequences. The State's Department of Environmental Protection was notified and consulted as to the steps necessary to contain the overflow and minimize any adverse environmental impact. The clean-up cost IMTT $300,000.00. Employees entrusted with operating and maintaining this elaborate chemical storage system owe a duty of care and candor to, not only IMTT, but to the communities neighboring this facility. These employees must adhere to high ethical and professional standards. When accidents happen, IMTT must have complete and reliable information to assess what went wrong in order to develop and implement measures necessary to avoid the recurrence of a similar event. Employees who engage in a deliberate plot to withhold the truth about their involvement, thereby depriving company investigators material information necessary for a thorough and trustworthy study of the event, violate this ethical and professional duty.
In furtherance of plaintiff's contention that there was a genuine issue of material fact, he refers to deposition testimony in another case, where IMTT failed to terminate an employee for discharging a pellet rifle in proximity to highly flammable storage tanks. He references the applicable portion of the deposition transcript in his appendix. These facts were neither argued nor presented to the Law Division judge, and plaintiff has not moved to supplement the record on appeal. We, therefore, will not consider them here. State v. Harvey, 151 N.J. 117, 201-02, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000).
In a summary judgment motion, the court must grant the non-moving party all favorable inferences from the competent evidence presented. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). We do not pass upon the credibility of plaintiff's assertions as that is reserved for the trier of fact. However, as the Brill Court re-emphasized, it is within our province "`to determine whether there is a genuine issue for trial.'" Id. at 540, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)). That the trier of fact makes determinations as to credibility "does not require a court to turn a blind eye to the weight of the evidence; the `opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" Big Apple BMW, Inc. v. BMW of N.Am., Inc., 974 F.2d 1358, 1363 (3rd Cir.1992) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986)), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Plaintiff has done no more than that. The overwhelming evidence presented convinces us that the motion judge correctly determined that, under the circumstances presented, there was no genuine issue of material fact that plaintiff would have been fired had IMTT known at the time of the Parlato letter that plaintiff had participated with his supervisor to lie and withhold knowledge concerning their involvement in, and the origin of, the hazardous chemical spill.
Plaintiff next argues that, even if it was adequately established that he would have been fired on March 14, the motion judge nevertheless erred in applying the after-acquired evidence doctrine to limit all damages. In response, defendants argue that dismissing "all damages from March 14, 1997 forward was totally consistent" with the decision in McKennon v. Nashville Banner Publishing Co., 513 U.S. *1116 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). We reject the arguments of both parties. In his written opinion, the motion judge correctly applied the after-acquired evidence doctrine to limit plaintiff from receiving "economic recovery" and from "seeking, by way of damages, reinstatement" on and after March 14. However, the June 8, 2001 order, mistakenly executed by the judge, precluded recovery for all damages, including non-economic and punitive damages, from March 14 forward.
We begin our analysis with a review of the after-acquired evidence doctrine and its applicability to the damages asserted here. In McKennon, Christina McKennon was discharged as part of a reduction in work force following thirty years of employment by the defendant. She filed suit alleging that her discharge violated the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.A. §§ 621-634, and seeking reinstatement or economic damages, i.e., front pay and back pay. During the pendency of the litigation, McKennon admitted at depositions that during her final year of employment she copied several confidential documents bearing upon the company's financial condition. Shortly after this revelation, the defendant notified her that had it known of her misconduct it would have discharged her at once.
Framing the issue, the Court in McKennon observed that, even though an employer may have discriminated in violation of the ADEA, it must determine "how the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered." Id. at 360, 115 S.Ct. at 885, 130 L.Ed.2d at 862. Recognizing that the doctrine has its underpinnings in equity, the Court stated that the notion of unclean hands does not bar relief "where Congress authorizes broad equitable relief to serve important national policies" or "`where a private suit serves important public purposes.'" Id. at 360, 115 S.Ct. at 885-86, 130 L.Ed.2d at 862-63 (quoting Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982, 990 (1968)). In an effort to strike a balance between the interests of the employer and the employee, the Court pointed out:
In determining appropriate remedial action, the employee's wrongdoing becomes relevant not to punish the employee, or out of concern "for the relative moral worth of the parties" but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing.

[Id. at 361, 115 S.Ct. at 886, 130 L.Ed.2d at 863 (citations omitted).]
The Court then determined that "as a general rule in cases of this type, neither reinstatement nor front pay is an appropriate remedy. It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." Id. at 361-62, 115 S.Ct. at 886, 130 L.Ed.2d at 863. With respect to back pay, the Court ruled that once an employer learns of wrongdoing that would have resulted in the legitimate discharge of an employee, the trial court should calculate back pay "from the date of the unlawful discharge to the date the new information was discovered." Id. at 362, 115 S.Ct. at 886, 130 L.Ed.2d at 864. The Court, however, added that the determination of the appropriate remedy should take "into further account extraordinary equitable circumstances that affect the legitimate interests of either party." Ibid.
No New Jersey State court has specifically addressed the issue of whether the after-acquired evidence doctrine applies to preclude non-economic and punitive damages. Nicosia v. Wakefern Food Corp., *1117 136 N.J. 401, 643 A.2d 554 (1994), a decision that predates McKennon, recognized that there is a split over how courts apply this doctrine, i.e., that some courts preclude all recovery based on after-acquired evidence, while others only restrict or reduce economic relief. Id. at 418, 643 A.2d 554 (citations omitted). Nicosia declined to address the issue further because the jury found the plaintiff not guilty of the misconduct that would have provided the basis for the defendant's after-acquired evidence defense, thus negating the defense. Id. at 420-21, 643 A.2d 554.
In Cedeno v. Montclair State University, 163 N.J. 473, 750 A.2d 73 (2000), the plaintiff pled nolo contendere in 1982 in Pennsylvania to four counts of bribery. Four years later the plaintiff applied for a job with Montclair State University (MSU) and answered in the negative a question on his job application as to whether he had any criminal convictions. Plaintiff sought damages for violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, and the LAD, along with common law claims. During discovery, MSU became aware of plaintiff's bribery conviction and moved for summary judgment. The Court affirmed substantially for the reasons expressed in our majority opinion, 319 N.J.Super. 148, 725 A.2d 38 (App.Div.1999), which held that exceptional circumstances existed that went beyond a "misrepresentation on an employment application which would have provided a basis for [the employee's] discharge." Id. at 156, 725 A.2d 38. Specifically, we concluded that the plaintiff was statutorily barred from obtaining public employment in New Jersey pursuant to N.J.S.A. 2C:51-2(d), which trumped any equitable concerns that might otherwise permit monetary recovery other than for economic loss resulting from violations of the LAD or CEPA. Id. at 162-63, 725 A.2d 38.
We recognized, however, that our Supreme Court has "`emphasized the strong public policy ... against employment discrimination' expressed in LAD," id. at 155, 725 A. 2d 38 (quoting Andersen v. Exxon Co., 89 N.J. 483, 492, 446 A. 2d 486 (1982)) (alteration in original), and the "similar `important public policies'" set forth in CEPA which "`seek[ ] to overcome victimization of employees.'" Id. at 155, 725 A.2d 38 (quoting Abbamont v. Piscataway Township Bd. of Educ., 138 N.J. 405, 418, 650 A.2d 958 (1994)) (alteration in original). We also observed that McKennon did not establish a blanket rule but instead recognized the need to "consider the equitable circumstances of each individual case." Id. at 158, 725 A.2d 38. Rather, we indicated that:
In view of the important public polices served by the LAD and CEPA, we have no hesitancy in concluding that an employer ordinarily may not defeat a wrongful discharge claim under either of these statutes simply by showing that the employee made a misrepresentation on an employment application which, if it had been discovered during the employment, would have resulted in the employee's discharge.

[Id. at 155, 725 A.2d38.]
In Massey v. Trump's Castle Hotel & Casino, 828 F.Supp. 314 (D.N.J.1993), the Federal District Court judge found that, although federal and state discrimination claims for front pay and reinstatement may be precluded by after-acquired evidence of an employee's misconduct, such evidence would not bar claims seeking redress for injuries caused by discriminatory conduct that has no connection with this misconduct. Id. at 322. "Precluding all recovery based upon reasons unrelated to the discriminatory conduct flies in the face" of laws intended to stop such conduct. Id. at 323.

*1118 [T]he use of after acquired evidence to bar a discrimination claim in its entirety could cause employees who did something wrong in the past to quietly endure discriminatory treatment rather than complain.... On the other hand, to require employers to reinstate or provide front-pay to an employee today that they can now fire legitimately tomorrow would be nonsensical.

[Ibid.]
In Miller v. Beneficial Management Corp., 855 F.Supp. 691 (D.N.J.1994), a gender and age discrimination case, the defendant asserted that the plaintiff's claims were barred by after-acquired evidence that plaintiff made misrepresentations on her resume and applications for health insurance, life insurance and pension benefits. Id. at 696-97. The Federal District Court judge observed that the plaintiff's LAD claim for back pay was equitable in nature and similar to claims under the Federal anti-discrimination statutes. Id. at 715. The judge also reasoned that the after-acquired evidence doctrine should be available as a defense to limit back pay under the LAD because the employee would not be entitled to those wages by virtue of her misconduct, and "equity will not grant the [employee] the windfall of receiving those wages." Id. at 713. He, however, came to a different conclusion with respect to non-economic compensatory damages under the LAD, damages unavailable under the Federal statutes:
Employee misconduct ... does not vitiate the employee's right to be free from racial or ethnic indignity, a right compensable under the NJLAD. Nor does the employee's misconduct diminish the psychological and emotional injury caused to the employee by the employer's violation of this right. There appears to be no principled basis, therefore, for the application of the after-acquired evidence defense in this case to bar compensatory relief for emotional suffering under the NJLAD.

[Id. at 716-17 (citations omitted).]
The judge also found that punitive damages should similarly be available because they are directed at deterring future discriminatory conduct by the employer and the "employer's allegedly discriminatory state of mind is unaltered by after-acquired evidence of an employee's misconduct." Id. at 717.
Applying these principles to the circumstances here, we hold that plaintiff's non-economic and punitive damages claims arising out of both common law and statutory allegations of discrimination are not limited by the after-acquired evidence doctrine. Claims for front pay or reinstatement, back pay or losses resulting from demotion or lack of promotion all bear a direct relationship to restoration of employment status, which might be jeopardized by the employee's past misconduct. These wage-based claims correspond with an employee's economic interest in a job that is protected by our anti-discrimination statutes. However, an employee's economic interest in being paid comes in direct conflict with the economic interests of an employer when the employer later learns of the employee's misconduct, which would have resulted in termination at the time the misconduct occurred, thus militating against payment of subsequent wages. These similar but conflicting economic interests justify application of the after-acquired evidence doctrine in order to balance the equities.
Unlike wage-based claims, a non-economic loss, such as emotional distress, if proven, relates to injuries that have no direct nexus to a plaintiff's status as an employee. Instead, they embody damages resulting from alleged misconduct of an employer, which, although directed at an employee, is nevertheless subject to redress *1119 because of indignities suffered, not because of the person's status as an employee. An employer who creates a hostile work environment should not be excused from responding in damages for personal injuries caused by its discriminatory conduct simply because it later learns that the injured employee did something in the past, which, if known at the time, would have caused his or her termination. The same rationale applies to claims for punitive damages, which are intended to deter especially egregious conduct, such as actual participation by upper management or willful indifference. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 624-25, 626 A.2d 445 (1993).
We are satisfied that the motion judge correctly applied the after-acquired evidence doctrine by only precluding damages for economic losses. However, he mistakenly executed an order that also barred claims for non-economic and punitive damages. Where there is a conflict between a judge's written or oral opinion and a subsequent written order, the former controls. State v. Pohlabel, 40 N.J.Super. 416, 423, 123 A.2d 391 (App. Div.1956); see also State v. Warmbrun, 277 N.J.Super. 51, 58 n. 2, 648 A.2d 1153 (App.Div.1994). We, therefore, modify the order to bar only those claims for economic loss from March 14, 1997 forward. Plaintiff's claims for non-economic and punitive damages are remanded for further proceedings.
Our decision effectively reinstates plaintiff's May 11, 1999 complaint to the extent it seeks non-economic damages. Accordingly, the January 11, 2002 order dismissing plaintiff's second complaint pursuant to R. 4:30A is set aside as moot. Where a related claim arises during the pendency of litigation,
the claimant must seek leave to file a supplemental pleading thereby submitting to judicial discretion the determination of whether the claim should be joined in that action or reserved for a subsequent suit, and if the claimant fails to so move, he will ordinarily be barred from raising the claim in a subsequent suit.
[McNally v. Providence Washington Ins. Co., 304 N.J.Super. 83, 92, 698 A.2d 543 (App.Div.1997).]
We, therefore, leave any further determination respecting plaintiff's non-economic damage claims based upon the allegations in his second complaint to further proceedings in accordance with either R. 4:27-1 or R. 4:38-1.
Remanded for further proceedings consistent with this opinion. No costs to any party.