IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
September 8, 2005 Session

## ERIC TETER  v.  REPUBLIC PARKING SYSTEM, INC.

**Appeal by permission from the Court of Appeals, Eastern Section
Chancery Court for Hamilton County
No. 01-1311     Hon. W. Frank Brown, III, Chancellor**

---

**No. E2003-02735-SC-R11-CV - Filed November 29, 2005**

---

The dispute in this case arises out of an employment contract which provides severance pay for an employee who is terminated for reasons "other than gross misconduct, fraud, embezzlement, theft or voluntary termination." The defendant employer ceased providing severance pay to the employee after the employer discovered that the employee had engaged in gross misconduct while still employed by the company. The employee sued for breach of contract, seeking the severance pay due under the contract; the employer responded that had it known previously of the gross misconduct, it would have fired the employee, thus absolving it of any duty to provide severance pay. The trial court granted summary judgment for the employee, after concluding that the employee had been involuntarily terminated, thus triggering the severance pay provision, and that there was no clear and convincing evidence that the employer would have fired the employee had it known of the gross misconduct. The employee was awarded $795,037.35, less thirty days severance pay already paid, plus prejudgment interest. The Court of Appeals affirmed. We hold that after-acquired evidence of employee misconduct need only be shown by a preponderance of the evidence in order to avoid liability in a breach of contract action, and because there is a genuine issue of material fact as to whether the employee would have been fired had the employer discovered the gross misconduct, we remand the case for trial. On the remaining issues raised by the employer, we affirm the Court of Appeals: the employee did not voluntarily resign from his position but was involuntarily terminated; the payment schedule found in the "Employment Protection Plan" regarding severance pay was incorporated into the employment contract; and the severance pay provisions did not constitute an illegal penalty.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals is Affirmed in Part and
Reversed in Part and Case Remanded**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, Jr., and JANICE M. HOLDER, JJ. joined.

John C. Harrison and William H. Horton, Chattanooga, Tennessee, for the appellant, Republic Parking System, Inc.

B. Stewart Jenkins, Chattanooga, Tennessee, for the appellee, Eric Teter.

## OPINION

### Factual Background

Republic Parking System, Inc. ("RPS") is a Tennessee corporation with its principal place of business in Chattanooga, Tennessee. It operates numerous parking facilities throughout the United States. James Berry ("Mr. Berry") is the majority stockholder and Chief Executive Officer of RPS. The plaintiff, Eric Teter ("Mr. Teter"), previously worked for Central Parking System, which was one of RPS's main competitors, and by 1994, was the General Manager and Vice President of European Operations for Central Parking System.

In 1995, Mr. Teter resigned his position with Central Parking System and began working for RPS as a regional vice president. His duties included the management of existing business as well as solicitation of new business. Mr. Teter and RPS entered into an employment agreement dated November 27, 1995, containing a severance pay provision under which Mr. Teter would receive 12 months base salary plus twelve months bonus and commission payments if he were "discharged for any reason other than gross misconduct, fraud, neglect of job responsibilities or voluntary termination."

Mr. Teter was later promoted to vice president of RPS's nationwide urban parking operations, at which time he and RPS entered into a new employment contract with an effective date of January 1, 1997 ("the 1997 contract"). This contract included the following provisions:

> EMPLOYER agrees to pay EMPLOYEE for said services the sum of One Hundred Thousand dollars gross per years base ($100,000.00), plus a sum equal to Fifteen (15.0%) of the monthly profits generated from the Urban Class "A" Operating Cities above <$12,500.00> . . . The bonus will be computed and paid each month within ten days of closing the accounts.
>
> . . . .
>
> (4) This contract may be terminated by either party upon One Hundred Twenty (120) days written notice unless EMPLOYEE is discharged or resigns as a result of the commission by him or her of an act involving theft, embezzlement, fraud or intentional mishandling of Company funds, in which event such termination will be effective immediately. In the event EMPLOYEE is discharged for any reason other than gross misconduct, fraud, embezzlement, theft or voluntary termination, EMPLOYEE will be entitled to severance pay under the terms of the "Employment

-2-

Protection Plan-Change in Ownership Structure" provision attached.

The "Employment Protection Plan" referred to in the 1997 contract includes the following:

A. In the event that James C. Berry is no longer the active Chairman and CEO of EMPLOYER or EMPLOYER is sold to an outside interest, then in such event EMPLOYEE has the option of voluntarily resigning, provided that such resignation becomes effective within one hundred eighty (180) days from date of change or sale with said lump sum payment as provided below being made on the date that such voluntary resignation become effective.

| Change in Ownership Structure | Employment Protection Plan |
|---|---|
| Years 1-2 of Employment | 1.0 time previous years salary and bonus. |
| Years 3-4 of Employment | 2.0 times previous years salary and bonus. |
| Years 5+ of Employment | 3.0 times previous years salary and bonus. |

The division of RPS of which Mr. Teter was in charge was profitable in 1998, 1999, and 2000. As a result, Mr. Teter received significant bonuses under his employment contract during those years.

In March 2001, Mark Huth ("Mr. Huth") became president and Chief Operating Officer of RPS. Mr. Berry continued as the Chief Executive Officer and remained the company's majority stockholder. Mr. Berry and Mr. Huth decided that the region of which Mr. Teter was in charge should be restructured and divided into two regions–one east of the Mississippi River and one west of the Mississippi River. It was their intention to reduce Mr. Teter's region to only that part located east of the Mississippi River.

On August 10, 2001, Mr. Huth presented Mr. Teter with a proposed new employment contract. Under this new contract, Mr. Teter's base salary would increase from $100,000 per year to $160,000 per year, but the formula by which his bonuses would be calculated would be changed so as to be less favorable to Mr. Teter. Additionally, the proposed employment contract did not contain any provision for severance pay. Mr. Teter met with Mr. Berry and Mr. Huth on August 13, 2001, at which time he rejected the proposed employment contract. Mr. Berry and Mr. Huth presented Mr. Teter with other alternative new contracts, none of which provided for a severance package as favorable as under the 1997 contract. Mr. Teter rejected each of the new proposals.

On September 5, 2001, Mr. Berry told Mr. Teter to take the next two days off from work, as other urban executives were coming to Chattanooga for a meeting and Mr. Berry believed it would

be best if Mr. Teter was not present because his contract issue had not been resolved. Between September 5, 2001, and September 10, 2001, when Mr. Teter returned to work, the locks to the RPS executive offices had been changed, and Mr. Teter was unable to access the offices.

On September 11, 2001, Mr. Berry delivered an inter-office memorandum to Mr. Teter which provides, in pertinent part:

> I am disappointed in that we have been unable to reach a mutually acceptable agreement for your continued employment and association with Republic Parking System . . . .
>
> . . . .
>
> In conclusion, I want to emphasize again, that I feel that we made you a good and honorable proposal, and it was a mistake for you not to have given it the serious consideration it deserved. From what I detected in our conversation yesterday, you were taking the position and made your decision based upon "it's just the principle" without giving credit to the overall fairness and merits of the offer.
>
> Having said all the above, since you have no desire to continue with RPS which you indicated, I guess we should part company and get on with life. Although under the circumstances we do not feel that we are required to provide any severance pay, we will pay you up to six (6) months the same as we paid Mark Pratt. This will be paid to you in the same manner in which you were being paid presently, twice monthly, including 50 percent of your estimated monthly bonus.

After Mr. Teter received the above memorandum from Mr. Berry, he began cleaning out his office in preparation for leaving RPS.

On September 12, 2001, one of RPS's employees noticed that the central processing unit of Mr. Teter's office computer was missing. Mr. Teter returned it the next day, stating that he had taken it in an attempt to delete some personal files. Apparently concerned that Mr. Teter had downloaded proprietary information belonging to RPS from his office computer, RPS sent the central processing unit of the computer to a data company for examination. Analysis of Mr. Teter's computer indicated that it had been used during business hours for viewing pornographic sites on the internet. Mr. Teter's internet use left at least 30,000 image files on the hard drive, the vast majority of which were sexually-oriented photographs.

Mr. Berry sent Mr. Teter a letter on October 24, 2001, stating:

> As I told you during our discussion [of October 19, 2001], I was very disappointed and shocked at the material that was discovered on your computer hard drive . . . . Inasmuch as it was obtained during working hours, it certainly falls under

the "Gross Misconduct" category of your employment agreement dated April 16, 1997. If I had known this material existed before or during the time of our employment contract discussions, I would have terminated you immediately.

Therefore, in view of the fact this new information has come to light, I am hereby terminating your employment on grounds of gross misconduct and withdrawing the entire memorandum that I presented to you on September 11, 2001 and all the provisions contained therein . . . .

You have been removed from Republic's payroll effective, October 16, 2001.

The record contains other evidence, however, tending to contradict the assertion in Mr. Berry's letter that he would have fired Mr. Teter immediately had he known of Mr. Teter's viewing of pornographic internet sites at work. During his November 2002 deposition testimony, Mr. Berry stated that "I never looked at [Mr. Teter] being terminated" and that "I'd still like to have him back [at work for Republic]." The deposition also included the following:

Question: Now, Mr. Berry, prior to September 10, 2001, did you ever tell any employee that you may not use your computer during office hours for other than company business?

Answer: No, I never told any employee anything like that.

Question: Do you know of any executive within your company that ever made such a statement to anyone else in the employ?

Answer: Personally, I do not.

Mr. Teter sued RPS on November 13, 2001, for breach of contract, seeking severance pay under the terms of the 1997 contract. Mr. Teter later filed a motion for summary judgment, which the trial court granted on July 31, 2003, concluding that Mr. Teter was entitled to $795,037.35, less thirty days severance pay already paid to him. This amount represented three times Mr. Teter's annual salary and bonus, as provided in the Employment Protection Plan referred to in the 1997 employment contract. Additionally, the trial court awarded prejudgment interest at the rate of 10% per annum.

In making its decision, the trial court found that RPS had discharged Mr. Teter; Mr. Teter did not voluntarily resign. The trial court held that after-acquired evidence of Mr. Teter's misconduct could be used as a defense, but that RPS had to show by clear and convincing evidence that it would have fired Mr. Teter immediately had it discovered this misconduct while Mr. Teter was still employed. The court concluded that there was no clear and convincing evidence that RPS would have fired Mr. Teter. The Court of Appeals affirmed the decision of the trial court. We granted review.

It is RPS's position that Mr. Teter voluntarily resigned his position with RPS and is therefore ineligible for severance pay. RPS also argues that the trial court erred in holding that after-acquired evidence of employee misconduct must be proven by clear and convincing evidence rather than by a preponderance of the evidence. It is RPS's position that there is a factual issue as to whether RPS would have fired Mr. Teter. Additionally, RPS argues that the severance pay provisions of the "Employee Protection Plan" were not applicable in this case and that the severance pay provisions constitute an illegal penalty. Finally, RPS contends that the trial court abused its discretion in awarding prejudgment interest.

## Standard of Review

The purpose of summary judgment is to resolve controlling issues of law rather than to find facts or resolve disputed issues of fact. Bellamy v. Fed. Express Corp., 749 S.W.2d 31, 33 (Tenn. 1988). Summary judgment is appropriate only when the moving party demonstrates that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See Tenn. R. Civ. P. 56.04; Penley v. Honda Motor Co., 31 S.W.3d 181, 183 (Tenn. 2000); Byrd v. Hall, 847 S.W.2d 208, 210 (Tenn. 1993). In reviewing the record, the appellate court must view all the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000). And because this inquiry involves a question of law only, the standard of review is de novo with no presumption of correctness attached to the trial court's conclusions. See Mooney v. Sneed, 30 S.W.3d 304, 306 (Tenn. 2000); Carvell v. Bottoms, 900 S.W.2d 23, 26 (Tenn. 1995).

## Analysis

### 1. Circumstances of the Cessation of Mr. Teter's Employment

As a preliminary issue, RPS argues that the lower courts erred in finding that RPS discharged Mr. Teter, thus triggering the severance pay provision of the 1997 employment agreement. Instead, RPS claims that Mr. Teter left the company voluntarily. The trial court found that RPS's actions amounted to a *constructive* discharge; the Court of Appeals found that RPS had *actually* discharged Mr. Teter. The Court of Appeals explained that RPS "told the plaintiff, without equivocation, that his employment, as memorialized by his contract, was to be no more." (Emphasis in original.)

The facts regarding the termination of Mr. Teter's employment are not disputed; the dispute is whether those facts constitute a voluntary or involuntary termination. Because the facts are not in dispute, the issue is amenable to resolution on motion for summary judgment. For the reasons stated below, we agree with the Court of Appeals that Mr. Teter's employment with RPS was involuntarily terminated, thus triggering the severance pay provision.

Mr. Teter signed an employment contract with RPS effective January 1, 1997. This contract did not have an expiration date, but was for an indefinite period of time. On August 10, 2001, Mr. Huth presented Mr. Teter with a proposed new employment contract. The reason for the new

contract was not due to the expiration of the prior contract, but was due to the company's desire to restructure the division in which Mr. Teter worked. Thus, during the time that RPS was attempting to renegotiate Mr. Teter's contract, Mr. Teter was still working under the 1997 contract, which remained in effect. RPS and Mr. Teter were unable to reach an agreement regarding a new contract because all the proposals contained terms less favorable to Mr. Teter.

On September 11, 2001, Mr. Berry wrote a letter to Mr. Teter, expressing his disappointment that they could not "reach a mutually acceptable agreement for [his] continued employment" with RPS and suggested that it was time for them to "part company and get on with life." Mr. Berry's deposition testimony clarifies further that Mr. Teter's employment was being terminated by the company:

> <u>Question</u>: And unless [Eric Teter] would accept the new contract, he did not have an option of remaining with your company under the old contract, did he?
>
> <u>Answer</u>: No.

The evidence is unequivocal that if Mr. Teter did not agree to a new, modified contract, he would be terminated. The evidence is also clear that Mr. Teter did not agree to a new contract.

> Modification of an existing contract cannot be accomplished by the unilateral action of one of the parties. There must be the same mutuality of assent and meeting of minds as required to make a contract. New negotiations cannot affect a completed contract unless they result in a new agreement.

<u>Balderacchi v. Ruth</u>, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1952) (citing <u>Neilson & Kittle Canning Co. v. F. G. Lowe & Co.</u>, 260 S.W. 142, 143 (Tenn. 1924)); <u>see also</u> <u>Harber v. Leader Fed. Bank for Sav.</u>, 159 S.W.3d 545, 552 (Tenn. Ct. App. 2004). Therefore, because Mr. Teter did not agree to modify his existing contract and RPS would not continue to employ him under the old contract, RPS terminated Mr. Teter's employment, and Mr. Teter did not voluntarily resign his position.

### 2. *Burden of Proof – After-Acquired Evidence*

After RPS terminated Mr. Teter's employment, and while it was paying severance pay to him, RPS discovered that Mr. Teter had been viewing pornographic materials during working hours. RPS claims that had it known about the pornography, it would have immediately fired Mr. Teter for gross misconduct and would not have had to provide any severance pay. Under the 1997 contract, RPS is not required to provide severance pay if the employee is fired for "gross misconduct." Thus, RPS seeks to use this after-acquired evidence to terminate any remaining obligations regarding severance pay that it would otherwise owe to Mr. Teter.

Noting that the issue of after-acquired evidence was one of first-impression in Tennessee, the trial court adopted the reasoning in <u>Lewis v. Fisher Service Co.</u>, 495 S.E.2d 440 (S.C. 1998), and granted summary judgment for Mr. Teter. <u>Lewis</u> states, in pertinent part:

> Although we find that after-acquired evidence should be admissible on the issue of liability, we recognize the potential dangers of allowing employers unrestricted use of such evidence. . . . Thus, we conclude that although after-acquired evidence should be allowed on the issue of liability, certain limitations must be put into place so as to prevent abuse by employers. This can be achieved by restricting use of after-acquired evidence in two ways. First, the employer must prove that the wrongdoing was significant, that it was of "such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." . . . Second, this proof must be established, not by a preponderance of the evidence, but by clear and convincing evidence. We believe that these two limitations will serve to exclude doubtful or insignificant evidence of employee wrongdoing, while allowing evidence of very severe wrongdoing that should properly be considered.

Lewis, 495 S.E.2d at 445 (citation omitted). Viewing the evidence in the light most favorable to the non-moving party, the trial court found that there was no clear and convincing evidence that RPS would have immediately terminated Mr. Teter had it discovered the pornography while Mr. Teter was still employed by the company. Therefore, the court concluded that Mr. Teter was entitled to judgment as a matter of law. The Court of Appeals affirmed the decision of the trial court, also adopting the aforementioned rule set forth in Lewis for the use of after-acquired evidence.

We agree that an employer may use after-acquired evidence of employee misconduct in defense of a breach of contract case if the employer can demonstrate that it would have fired the employee had it known of the misconduct. However, rather than applying the clear and convincing standard to the evidence, we hold that the evidence need only be shown by a preponderance of the evidence.

While this is not a breach of contract case in the same sense as the cases cited below dealing with the application of the after-acquired evidence doctrine, the same analysis applies. In the cases that follow, the controversy arose after the employee was terminated, and that employee brought a suit against the former employer claiming wrongful termination based either on breach of contract or on public policy grounds. By contrast, Mr. Teter's breach of contract claim does not relate to his termination, but rather to RPS's failure to continue his severance pay under the contract. Mr. Teter's right to severance pay is not dependent upon RPS's breach of the employment contract; rather, Mr. Teter is entitled to severance pay unless his discharge is based on gross misconduct or certain other types of conduct specified in the agreement. Thus in this case, in the absence of gross misconduct by Mr. Teter, RPS would be in breach of the employment agreement in failing to provide the severance pay required under that contract.

The application of the after-acquired evidence doctrine as a bar to liability presents an issue of first impression in Tennessee. A majority of jurisdictions allow the use of after-acquired evidence

either as a complete bar to an employee's recovery or to mitigate an employee's damages.[1]  See generally, Stephen J. Humes, Annotation, <u>After-Acquired Evidence of Employee's Misconduct as Barring or Limiting Recovery In Action For Wrongful Discharge</u>, 34 A.L.R.5th 699 (1995); <u>see also</u> <u>O'Day v. McDonnell Douglas Helicopter Co.</u>, 959 P.2d 792, 795 (Ariz. 1998).  Those jurisdictions that have concluded that a complete bar to recovery is appropriate, generally reason that under well-established principles of contract law, the prior misconduct of the employee excuses the employer's subsequent breach.  <u>See</u> <u>Crawford Rehab. Servs., Inc. v. Weissman</u>, 938 P.2d 540, 547 (Colo. 1997); <u>Gassmann v. Evangelical Lutheran Good Samaritan Society, Inc.</u>, 933 P.2d 743, 745 (Kan. 1997); <u>McDill v. Environamics Corp.</u>, 757 A.2d 162, 166 (N.H. 2000); <u>see also</u> Restatement (Second) of Contracts, § 237 (1981).  Comment c, illustration 8 to section 237 of the Restatement is directly on point:

> A and B make an employment contract.  After the service has begun, A, the employee, commits a material breach of his duty to give efficient service that would justify B in discharging him.  B is not aware of this but discharges A for an inadequate reason. A has no claim against B for discharging him.

Courts allowing the use of after-acquired evidence have required the employer to show that (1) the employee was guilty of some misconduct of which the employer was unaware; (2) the misconduct would have justified discharge of the employee; and (3) had the employer known of the misconduct, the employer would have discharged the employee.  <u>See</u> <u>Gassmann</u>, 933 P.2d at 745; <u>McDill</u>, 757 A.2d at 166.  We agree that in a breach of contract case, "after-acquired evidence of employee misconduct is a defense to a breach of contract action for wages and benefits lost as a result of the discharge if the employer can demonstrate that it would have fired the employee had it known of the misconduct."  <u>O'Day</u>, 959 P.2d at 799.[2]  This corresponds with the first prong of the test set forth in <u>Lewis</u>, which requires evidence of employee wrongdoing of "such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  495 S.E.2d at 445 (citations omitted).

---

[1] In wrongful termination cases which implicate major public policy concerns, many jurisdictions apply the after-acquired evidence doctrine only to limit an employee's damages.  <u>See, e.g.</u>, <u>McKennon v. Nashville Banner Publ'g Co.</u>, 513 U.S. 352 (1995) (applying the doctrine in an age discrimination case); <u>Walters v. United States Gypsum Co.</u>, 537 N.W.2d 708 (Iowa 1995) (retaliatory discharge); <u>Trico Tech. Corp. v. Montiel</u>, 949 S.W.2d 308 (Tex. 1997) (retaliatory discharge under workers' compensation); <u>Barlow v. Hester Indus., Inc.</u>, 479 S.E.2d 628 (W.Va. 1996) (employment discrimination).  This provides "a compromise wherein the wrongdoing of both employer and employee is considered in determining damages, ensuring that neither party receives a windfall."  <u>Trico Tech. Corp.</u>, 949 S.W.2d at 312.  This protects employees by allowing compensation for discriminatory or retaliatory discharge, while at the same time protecting employers by allowing the wrongdoing of a dishonest employee to be taken into account and limiting the amount of damages.

[2] This does not mean, however, that after-acquired evidence of employee misconduct is always a complete bar to recovery.  We agree with the reasoning in <u>McKennon</u> and its progeny that in wrongful termination cases which implicate major public policy concerns, such as discrimination or retaliatory discharge, application of the after-acquired evidence doctrine only serves to limit an employee's damages and is not a complete bar to recovery.  <u>See</u> <u>McKennon</u>, 513 U.S. at 362-63.

It is on the issue of burden of proof that we disagree with <u>Lewis</u> and therefore the lower courts in this case. <u>Lewis</u> requires that the evidence of the employee misconduct and the employer's intent to fire the employee had it known of the misconduct to be clear and convincing. 495 S.E.2d at 445. However, no other jurisdiction that has addressed the issue of after-acquired evidence and accepted its use either as a complete bar or as a limit to liability, requires that the evidence be clear and convincing. <u>See, e.g.</u>, <u>Brooks v. Lexington-Fayette Urban County Housing Auth.</u>, 132 S.W.3d 790 (Ky. 2004) (specifically stating that the evidence is to be shown by a preponderance); <u>see also</u> <u>McKennon v. Nashville Banner Publ'g Co.</u>, 513 U.S. 352 (1995); <u>McCaskill v. ConAgra Foods, Inc.</u>, 296 F. Supp. 2d 1311 (M.D. Ala. 2003); <u>Carroll v. Bayerische Landesbank</u>, 150 F. Supp. 2d 531 (S.D. N.Y. 2001); <u>Schiavello v. Delmarva Sys. Corp.</u>, 61 F. Supp. 2d 110 (D. Del. 1999); <u>Camp v. Jeffer, Mangels, Butler & Marmaro</u>, 41 Cal.Rptr.2d 329 (1995); <u>Crawford</u>, 938 P.2d at 547; <u>Brown Distrib. Co. of West Palm Beach v. Marcell</u>, 890 So.2d 1227 (Fla. Dist. Ct. App. 2005); <u>Walters v. United States Gypsum Co.</u>, 537 N.W.2d 708 (Iowa 1995); <u>Gassmann</u>, 933 P.2d at 745; <u>Taylor v. Int'l Maytex Tank Terminal Corp.</u>, 810 A.2d 1109 (N.J. Super. Ct. App. Div. 2002); <u>McDill</u>, 757 A.2d at 166; <u>Johnson v. Bd. of Trs. of Durham Technical Cmty. Coll.</u>, 577 S.E.2d 670 (N.C. Ct. App. 2003); <u>Barlow v. Hester Indus., Inc.</u>, 479 S.E.2d 628 (W.Va. 1996). For the reasons which follow, we agree with the majority that the preponderance standard is the correct standard to use in this case.

The standard of proof required in a case "serves to allocate the risk of error and to instruct the factfinder as to the degree of confidence society expects for a particular decision." <u>Estate of Acuff v. O'Linger</u>, 56 S.W.3d 527, 536 (Tenn. Ct. App. 2001). Generally, in civil cases, facts are proved by a mere preponderance of the evidence. <u>Endowment Rank of Order of K.P. v. Steele</u>, 63 S.W. 1126, 1128 (Tenn. 1909); <u>Burchett v. Stephens</u>, 794 S.W.2d 745, 748 (Tenn. Ct. App. 1990). The preponderance of the evidence standard requires that the truth of the facts asserted be more probable than not, whereas the clear and convincing evidence standard requires that the truth be highly probable. "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." <u>Hodges v. S.C. Toof & Co.</u>, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992).

The higher standard of clear and convincing evidence is used to promote important public policy and preserve prior judicial orders. <u>Estate of Acuff</u>, 56 S.W.3d at 536. For example, the Tennessee legislature has imposed a clear and convincing evidence standard in certain instances where it has found a compelling public policy. <u>See</u> Tenn. Code Ann. § 31-2-105 (2004 Supp.) (establishment of parental relationship for purposes of intestate succession); Tenn. Code Ann. § 36-1-113 (2004 Supp.) (termination of parental rights); Tenn. Code Ann. § 56-7-1201(e) (2004 Supp.) (existence of unknown motorist under uninsured motorist statute). The courts have also imposed a clear and convincing standard in circumstances involving extraordinary remedies. <u>See</u> <u>Estate of Acuff</u>, 56 S.W.3d at 536 (setting aside deed on grounds of fraud); <u>Hodges</u>, 833 S.W.2d at 901 (award of punitive damages); <u>Pierce v. Flynn</u>, 656 S.W.2d 42, 46 (Tenn. Ct. App. 1983) (reformation of a contract).

We find no compelling public policy reason for requiring the imposition of a clear and

convincing standard for after-acquired evidence in a breach of contract case.[3]  There is nothing inherently suspect about after-acquired evidence in an employment contract dispute.  If such evidence is credible, there is no rationale for treating it differently from other evidence in a contract dispute.  Juries have always been considered capable of comprehending such evidence, weighing it, and determining its probative value in the ultimate resolution of the case.  It is for a jury to decide if an employee's misconduct is of such severity that he or she would have been fired immediately had the employer known of it.  A jury could just as easily determine that the misconduct did not rise to that level of severity, and the employer was simply fishing for any misconduct in the employee's past in order to justify the firing.  There need not be a heightened standard of evidence in order for a jury to properly make these determinations.

Thus in order to defend the breach of contract claim brought by Mr. Teter, we hold that RPS needs to show, *by a preponderance of the evidence*, that Mr. Teter was guilty of gross misconduct and that had RPS known of this misconduct, it would have fired Mr. Teter immediately.

Applying the preponderance of the evidence standard, we conclude that there is an issue of material fact as to whether RPS would have fired Mr. Teter had it discovered that Mr. Teter was viewing pornography during working hours.  Mr. Berry sent Mr. Teter a letter on October 24, 2001, stating: "If I had known this [pornographic] material existed before or during the time of our employment contract discussions, I would have terminated you immediately."  However, there was also evidence that suggested that Mr. Teter would not have been fired immediately upon discovery.  For example, Mr. Berry stated in his deposition that he would still like to have Mr. Teter working for the company.  Additionally, no one ever told the employees of RPS that they were not to use the internet for personal use during working hours.  The Court of Appeals found that in light of the evidence suggesting that Mr. Berry would not have fired Mr. Teter, the October 2001 letter did not amount to clear and convincing evidence that RPS would have in fact fired Mr. Teter.  However, under a preponderance standard, there is a material issue of fact that cannot be resolved on motion for summary judgment.  Therefore, we remand this case for trial.

### 3. Incorporation of the "Employee Protection Plan"

RPS argues that the evidence did not support the conclusion that the 1997 contract unambiguously incorporated the severance payments set forth in the Employment Protection Plan or that the severance payments were applicable under the circumstances of this case.  RPS argues that the severance pay provision was never triggered because neither of the threshold events, i.e., a change in ownership or RPS going public, ever occurred.

The 1997 contract provides that if an employee is discharged for reasons other than gross

---

[3]  The heightened standard is also contrary to the treatment of other employment claims.  For example, to disqualify a terminated employee from unemployment compensation, employers are only required to prove misconduct by a preponderance of the evidence.  See Tenn. Code Ann. § 50-7-303 (2004 Supp.); Jackson v. Bible, 611 S.W.2d 588, 590 (Tenn. Ct. App. 1980).

misconduct, fraud, embezzlement, theft or voluntary termination, he is entitled to receive severance pay "under the terms of the 'Employment Protection Plan-Change in Ownership Structure' provision." The "Employment Protection Plan" discusses two scenarios under which an employee can receive severance pay for *voluntarily* resigning – (a) a change in the CEO or sale of the company or (b) RPS going public. RPS contends it only owes severance pay if one of the triggering events set forth in the Employment Protection Plan occur. On the other hand, Mr. Teter argues that the 1997 contract, by its terms, only intended to incorporate the *payment schedule* found in the Employment Protection Plan, and not the triggering events contained therein.

The interpretation of a contract is a matter of law and therefore is reviewed de novo. See Hamblen County v. City of Morristown, 656 S.W.2d 331, 335-36 (Tenn. 1983). "When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999). If a contract's language is clear and unambiguous, then the literal meaning of the language controls the outcome of the contract dispute. See Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 890 (Tenn. 2002). Additionally, "all provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." Guiliano, 995 S.W.2d at 95.

We agree with the trial court and Court of Appeals that the only reasonable interpretation of the 1997 contract is that the parties intended to incorporate only the payment schedule from the Employment Protection Plan into the 1997 contract. The Court of Appeals explained:

> It is clear that the parties intended that the plaintiff be provided severance pay, provided he was not discharged for gross misconduct, fraud, embezzlement or theft, or voluntarily terminated his employment. The position advanced by RPS – that the plaintiff was only entitled to severance pay in the event the company was sold or Mr. Berry was replaced – is simply untenable. The triggering event in the plaintiff's employment contract was clearly intended to be wrongful termination and wrongful termination only. While severance pay was also to be available in the event of a sale of the company or a change in the company's leadership, these triggering events were in addition to, rather than in place of, the event of wrongful termination.

For these reasons, Mr. Teter would be entitled to receive severance pay under the terms of the 1997 contract, at the amount set forth in the Employer Protection Plan, so long as RPS cannot show that it would have fired him for gross misconduct, as discussed above.

*4. Application of Guiliano v. Cleo, Inc.*

RPS also contends that the severance pay provisions constitute an illegal penalty and argues that the intermediate court erred in its interpretation of Guiliano v. Cleo, Inc., 995 S.W.2d 88 (Tenn. 1999), in finding that the severance pay provisions were valid.

In Guiliano, we differentiated between liquidated damages, which may be found to constitute a penalty, and severance pay, where recovery would be absolute upon the employee's termination.

> The term "liquidated damages" is defined by case law as a "sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injuries should a breach occur." The stipulated amount represents an estimate of potential damages in the event of a contractual breach where damages are likely to be uncertain and not easily proven.

> In contrast, the recovery of severance pay is not conditioned upon a breach of contract or a reasonable estimation of damages. Generally, severance pay is a form of compensation paid by an employer to an employee at a time when the employment relationship is terminated through no fault of the employee. The reason for severance pay is to offset the employee's monetary losses attributable to the dismissal from employment and to recompense the employee for any period of time when he or she is out of work. The amount of payment is generally based upon the types of services and the number of service years performed by the employee on behalf of the employer.

995 S.W.2d at 96-97 (citations and footnote omitted).

We also differentiated between liquidated damages as compensation and liquidated damages as a penalty.

> The fundamental purpose of liquidated damages is to provide a means of compensation in the event of a breach where damages would be indeterminable or otherwise difficult to prove. By stipulating in the contract to the damages that might reasonably arise from a breach, the parties essentially estimate the amount of potential damages likely to be sustained by the nonbreaching party. "If the [contract] provision is a reasonable estimate of the damages that would occur from a breach, then the provision is normally construed as an enforceable stipulation for liquidated damages." However, if the stipulated amount is unreasonable in relation to those potential or estimated damages, then it will be treated as a penalty.

Id. at 98.

Applying these principles to this case, the Court of Appeals found that the severance pay provisions are not a penalty. We agree. The 1997 contract states that Mr. Teter is entitled to severance pay if he is discharged for reasons other than gross misconduct, fraud, etc. In other words, he will receive severance pay if he is "terminated through no fault" of his own. See id. at 97. The amount of severance pay set forth in the Employment Protection Plan is based upon the plaintiff's salary and bonuses, commensurate with "the number of service years performed by" Mr. Teter. See id. Thus we find no error in the lower court's determination that the severance pay provisions did

-13-

not constitute an illegal penalty.

## 5. *Prejudgment Interest*

Because we are vacating the trial court's award and remanding the case for trial, the issue of whether the trial court abused its discretion in awarding prejudgment interest is moot.

## Conclusion

In sum, we hold that an employer may use after-acquired evidence of employee misconduct in defense of a breach of contract action, and that evidence need only be shown by a preponderance of the evidence. Because there is an issue of material fact as to whether RPS would have fired Mr. Teter had it discovered that Mr. Teter was viewing pornographic materials during working hours, summary judgment was inappropriate, and we remand the case for trial. On the remaining issues raised by RPS, we affirm the Court of Appeals: Mr. Teter did not voluntarily resign from his position but was involuntarily terminated; the payment schedule found in the Employment Protection Plan was incorporated into the 1997 contract; and the severance pay provisions did not constitute an illegal penalty. Accordingly, the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the trial court for trial.

Costs of this appeal are assessed equally between the parties Eric Teter and Republic Parking System, Inc., and their sureties, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, JUSTICE