IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 28, 2015 Session

# IN RE: KIARA S.

**Appeal from the Circuit Court for Sevier County**
**No. 2013-AD-32-IV     O. Duane Slone, Judge**

---

**No. E2015-00003-COA-R3-PT-FILED-OCTOBER 29, 2015**

---

Rachel L.S. ("Mother") and Brandon M.R. ("Step-father") filed a petition seeking to terminate the parental rights of Paul P. ("Father") to the minor child Kiara S. ("the Child"). After a trial, the Circuit Court for Sevier County ("the Trial Court") entered its order dismissing the petition after finding and holding, *inter alia*, that Mother and Step-father had failed to prove by clear and convincing evidence that grounds existed to terminate Father's parental rights for abandonment by willful failure to visit or for abandonment by willful failure to support. Mother and Step-father appeal the dismissal of their petition. We find that the evidence in the record on appeal does not preponderate against the Trial Court's findings, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

James R. Hickman, Jr., Sevierville, Tennessee, for the appellants, Rachel L.S. and Brandon M.R.

Andrew E. Farmer, Sevierville, Tennessee, for the appellee, Paul P.

# OPINION

## Background

Mother and Father never married and are the biological parents of the Child who was born in 2006. The Child has resided since her birth primarily with Mother. Mother and Father entered into a private written agreement with regard to child support and visitation, and the parties operated under this agreement for approximately the first five years of the Child's life.

Mother and Step-father married in July of 2012, and Mother and the Child moved into Step-father's house. In July of 2013, Mother and Step-father filed the petition seeking to terminate Father's parental rights to the Child alleging, in pertinent part, that Father had abandoned the Child by his willful failure to visit and by his willful failure to support. The petition alleged that Father had not had contact with the Child and had not paid child support for approximately a year and a half prior to the filing of the petition. Father answered the petition and filed a petition seeking entry of a permanent parenting plan. The case proceeded to trial in May of 2014.

Mother testified at trial about the signed written agreement she and Father entered into with regard to visitation and support. Under this agreement, Father had visitation with the Child overnight on Tuesday and Friday nights. Mother testified that Father followed the schedule until approximately a year and a half prior to the filing of the petition. The last overnight visit Father had with the Child occurred in December of 2011.

Mother testified that because Father does not drive either Mother or Father's mother ("Grandmother") would transport the Child to her visits with Father. Mother was asked why Father stopped visiting the Child, and she stated: "Because he no longer could - - his mom didn't want to come and pick her up or drop her off, and I said, I'll be willing to meet you at Walter State or something, you know, meeting somewhere, but it's not my job to do both ways and everything, so he just gave up." When asked why Grandmother stopped transporting the Child, Mother stated: "She probably got tired of it." Mother testified:

> I was trying to be helpful in some way and I said, well, you know, would you like to have some dinners with her through the week and everything and he said yes. I said I will even drop her off to dinner and I will come pick her up just so you will have time together and that happened two or three times, and the last time he brought friends and I said, no more, this is supposed to be about you and her spending time together, not having your

2

friends.  But if you would like to go back to the papers, I am absolutely willing to do that.  She is here for you on the nights that you're supposed to have her, according to our papers, and he just quit calling, quit doing everything.

Mother testified that this occurred in February of 2012.

Mother testified that after February of 2012 she would text Father to try to get child support, but that the last time she received support was in June of 2012.  Mother stated: "[the phone number Father] texted me on in June of 2012 was my husband, Brandon's, phone.  And he's had that phone number for many years."  Mother testified that Step-father still had the same phone number at the time of trial.

Mother testified that the Child calls Step-father 'dad' or 'daddy.'  Mother testified:

You know, at first [the Child] said, I'm going to call him Daddy B.  I said okay.  And then it turned into Daddy, and I said, if that's what you want to call him, then that's - - he was serving as the daddy, that's who was taking care of her and with her all the time whenever we would go out to do things and take care of her when she's sick and go to the hospital when needed, so I thought she deserved to call him daddy if that's what she wants to do.

Mother testified that she allowed the Child, who was approximately five years old at the time, to make the decision about what name to use to refer to Step-father.  Mother was asked if she corrected the Child when the Child referred to Step-father as 'Daddy,' and she stated: "No. . . .  Because that's who was taking care of her and acting as daddy."  Mother was asked if Step-father was the one who Mother wanted as the Child's father, and she stated:

I mean, I don't really remember, I guess. . . .  I mean, no, I'm not saying that.  I mean, of course, I mean, I would have loved for, you know, that to have been her dad, but my intentions were absolutely not to put [Father] out if that's what you're saying.

Mother admitted that she got engaged to Step-father in December of 2011 right around the same time that she alleges that Father decided not to have contact with the Child.  Mother stated: "Well, I assumed it was because of the ride that he was talking about. . . .  I mean, he was - - I don't know if that is right."  Mother admitted that Father was involved in the Child's life for the first five and a half years and that during that time the Child would stay with Father an average of two nights per week.  Mother admitted that during that time the Child built a relationship with Father and with Father's parents.

Mother was asked if Father was a good father, and she stated: "When we were together, yes. I mean, he was there and everything. But we're not and then whenever I married and everything it was just, oh, well, we're not together, so why try."

Mother testified that she has not received a child support payment since June of 2012. Mother was asked if she accepted a payment on April 30, 2014 sent certified mail, and she stated: "No." Mother was asked if it was her goal to have Father remain a part of the Child's life, and she stated: "Was it my goal? When I filed with Jim Hickman [the attorney who filed the instant petition for Mother and Step-father], it was my goal." Mother was asked if her engagement effectively stopped Father from seeing the Child, and she stated: "No, I highly think it was because I was with somebody else and so he was just like, well, we're broke up."

Mother was asked if she thought it was healthy for the Child to have Father involved in her life for the first five years and then suddenly have him removed from her life, and Mother stated:

> She's extremely happy right now. She feels extremely comfortable. She knows [Step-father] is not going anywhere. She knows he's going to always be there for her. I mean, he gave her her own ring during our ceremony and said, you know, I will be here for whatever you need me to be here for you.

Mother met Step-father around her birthday in 2011 and the Child met him in September of 2011. After Mother and Step-father married, Mother and the Child moved into Step-father's house. Mother admitted that she never has given Father the mailing address for where she lives. Mother claims that she does not receive her mail there. Mother admitted that there is a mailing address where she currently lives, but she has not given Father that address. Mother stated: "but his parents both knew it." Mother was asked how Father used to provide child support to her, and she stated: "He would just give it to me whenever he was getting [the Child]. The last time I got child support he put it in my parents [sic] mailbox." Mother testified that Father usually gave her cash.

When Mother was asked if she texted Grandmother to advise about the Child's recital and told Grandmother not to tell Father, she stated:

> I could have because any time that [Father] wanted to see [the Child] or do anything with [the Child] he needed to go through me for that. He wanted to do everything through his mother for it, and he needed to talk to me about it. I didn't want to go through his mom about it.

4

Mother admitted that the Child had some visits with Father's parents after Mother filed the petition. She stated: "I told [Grandmother] that this is a grandparents [sic] visit, if [Father] wants to have a visit he needs to contact me about that. So let's keep it grandparents when you're asking, and then he can call me to talk about a visit." Mother admitted that Father does not have her phone number, but stated that Father's parents do.

Father testified that he lives with his mother and father and that he works as a personal trainer. Father last saw the Child in July of 2012. He was asked if he called Mother and requested another visit after that time, and he stated: "Every time I've been in contact with [Mother] she refuses everything, and then there's times that she would just go on and go on about not answering texts or not answering calls." Father admitted that it was his word against Mother's. Father was asked if he ever started a paternity action or filed a petition for visitation, and he stated:

> I started inquiry about getting lawyers right then at that point. I've been through several people and I couldn't afford actually to throw down a down payment, which everybody wanted retainer fees, and that's when - - after searching and searching, just saving money, that's when I got [my attorney], which was actually months before she came to you. We started discussing about what I need to do, and then he started helping me out with payments.

Father was asked if he had called Mother to set up visits, and he stated:

> Not called her. She's gone through my mother because I didn't have any contact with her, and every visit that [the Child] was allowed to have over there with my parents, I was not allowed to be in contact with her, and if I was, whether it be - - I was there presently or, you know, on the phone, she wouldn't let her come back over.

Father also testified:

> We had several times where I used to call [the Child] on the days that I didn't have her, and we had a specific time set because [Mother] would only allow me to call at 10:30 in the morning, and if I called one minute after that, whether I was at a job or working or anything, she would not let me speak to her.

Father was asked if he had sent a letter by certified mail in an attempt to send child support to Mother, and he stated:

5

I've been trying to send for a few months. That was the address that I was aware that she was at. . . . Those are the addresses that were printed. We actually had to go to the courthouse here to find the addresses for it, because like was stated earlier about having only one mailbox over there and it's [Step-father's] mother's address. I guess nobody - - there is another mailbox, but nobody answers the door. So it keeps getting sent back.

Father testified that the last address he had for Mother was Mother's parent's address.

With regard to child support Father testified:

I started not getting [the Child] periodically throughout that year, and I continued to pay along with other things, doctor bills, her Mother's Day Out bills and everything, which at one point [Mother] told me to stop doing because [Step-father] would pay for it after that, which was - - that statement actually came from in July, the last time I made that payment, which was an extra $140 usually a month, and then on top of whatever else [the Child] needed, I always supplied for and paid for, only to where [Mother] stopped letting me have her altogether that I started trying to put that money that I was taking with [the Child] towards, you know - - putting towards the lawyer fees.

Father was asked to explain why his parental rights should not be terminated, and he stated:

This has all been a big complete misunderstanding. This is her word and her manipulating everybody that's around her, making things her way, and that's just the way she is. I've always told her no, and me and [the Child] always had the best relationship that you could possibly think between a father and a daughter.

Any time that we are around each other, it was perfect. Anytime she needed something, I had it. Any time she, [Mother] was sick, even for like there would be times where - - she can think of one time, of course, but there was numerous times where she would be sick and we would keep her, you know, and everybody would work around their work schedule for almost even - - over a week at a time bouncing around, and there was more than just one occasion that that would happen. And I was there for her, everything she needed, like I would take her at any given point.

And when this offer started is because when I found out that [Mother] was engaged to [Step-father], it happened within two-and-a-half months. If you knew [Mother's] history between people and every time we would make up, break up, you know, and get back together, every place that we've had a house together, it wouldn't even be - - there was sometimes, sir, she would have another man in the house within 48 hours, and she would lie about people being there, lie about people drinking in front of [the Child]. I would go over to her basement apartment and find bottles of alcohol on the ground. And that's the stuff I would get upset about.

The thing that I got upset about with [Step-father] here is that I was upset that she was throwing somebody into [the Child's] life that she didn't even know anything about, that [the Child] knew anything about, and what [Mother] does is just push [the Child] in front of these people and keeps shoving them down her throat until that's all she knows. I've seen her do it numerous times. Now, I'm glad that, you know, she's actually got somebody that she's married to and she's, you know, got a family and all that, that's great. I never objected to any of that. That's none of my business.

But what I was getting angry about is that through that process she started continually making the dates less and less and less through the problems that were complications that we had with my mother and everybody coming and picking her up at her house. There's several occasions where my dad got upset because their dog would come after him when he'd come out to get the baby. And so he asked if, you know, she could drop her off at my workplace, which at the time [Mother] was living at her parents [sic] house, which is not even three minutes away from my workplace. It is literally right there.

She refused to drop her off right there at my workplace just for two seconds so my parents could pick her up right there in the front of - - even - - she didn't have to come inside, and she would never let [the Child] even come inside the studio. There was a couple of times where [the Child] would be off with me on like a Tuesday night and come over the next Wednesday and I'd go into work with her, and she'd sit and play with all the kids and everything, because we do tumbling classes and everything, and as soon as [the Child] would get picked up and [Mother] found out about her being in there, she was never allowed to come in there again.

She would get so furious about her even being any other place besides where she didn't know - - like it's a Christian based studio. There's nothing going on in there besides what it is. It's dance, and [the Child] loves dance, and plus she's with me. I feel she could - - any place I feel is safe I would feel, you know, she could be with. [Mother] felt differently because she didn't know the people that were in there, which is understandable for a parent, but I never understood the people that were around her either. So it was basically she can do stuff with [the Child] and have her around anybody, but I was not allowed.

And when it comes to the birth certificate thing, of course she's going to say she never refused me to be on the birth certificate and everything. Every single time I asked to get put on that birth certificate, there was always some kind of complication or problem and we never got to it.

With the child support thing where my name is stated on the - - stated for saying that whatever, that I get parental rights, I actually never understood that was actually a parental - - like that's putting me on the birth certificate, hearsay or whatever. I actually never understood that, so if I'd known that then I would have just pushed a lot of other things with the court, but that was years before even this. But the only reason we did that was because we already had a mutual agreement with the money and basically we were lying to the state so she could keep her insurance. So that's all that was.

Father testified that Mother threatened him "a few times" with a restraining order if he showed up at her house. Father was asked if he felt that Mother had done anything to stand in the way of him having a relationship with the Child, and he stated: "On many occasions. I mean, even presently." Father further explained:

Well, the Court by itself, but her gradually taking her times away from me. When we did come up like the time that she spoke of earlier where she was talking about where we went to a place and I decided to bring friends over there around [the Child], it's a public place, people show up.

She didn't approve of the people because she didn't know who was there, and any time there was ever a female around me or anything, even if it was just a friend, she would immediately get on a

8

- - and just start yelling at me about who's around [the Child], who's around this and that, you know, I don't want her around anybody, you know, like this. But these people - - I never put her in an unsafe environment. I never had her around anybody that I would think unfit on any case.

Father testified that he wants to be a part of the Child's life and stated: "I want just my baby back, but I want some force of authority to tell her that she can't tell me no, and that's what this whole thing is about." Father testified that prior to Mother's engagement he communicated directly with Mother about visitations and that after her engagement "they started gradually not being through me and she would only contact through my mother."

Grandmother testified that she found out that the Child was her grandchild after the Child was born. Grandmother was asked if she developed a relationship with Mother, and she stated:

It was scary at first, you know, because I had met [Mother] actually about a year before that, maybe a year before that, because [Father] was training her for a contest. And I met her briefly then where he used to live and stuff. But then they split up, I guess, or whatever, and he had actually kind of kept track of her through that time and told me that she had got married[1], she was pregnant . . . . And then he actually - - he told me that he seen [Mother] in a hospital, and the baby - - because somebody he knew, their baby was born the same day, and he saw [Mother] in the hospital then. And then it was about a month later then that I found out that [the Child] was ours.

Grandmother testified that she and her husband were involved in the Child's life from that point on. Grandmother was asked about testimony from others that made her seem "like the mediator," and she stated: I was put in the middle a lot, and that was rough." Grandmother was asked if something happened when the Child was approximately five and a half years old, and she stated: "The both of them moved on. I mean, she met [Step-father] . . . ." Grandmother testified that things began to "crumble right after Christmas. . . . '12. . . . Right after Christmas, the first of the year." She testified:

I would either text or call [Mother] or - - and I said, you know, where's K [the Child], because that's K, you know, or princess, and is she coming

---

[1] The evidence in the record on appeal shows that Mother had been married to and divorced from another man prior to her marriage to Step-father.

over, and she'd say, no. And then I started getting it more and more. And then she would bring her over, you know, like at a special day, when she'd bring her over and stuff. And then it would start out, she can come over as long as [Father] is not there.

In September or October of 2011 Mother told Grandmother that she did not want the Child at Father's work. Grandmother testified that "it would get to the point where [Mother] didn't want [the Child] to talk to [Father] on the phone either." Grandmother testified that she "called and told [Father], said I'm caught between a rock and a hard place. I want to see my grandchild, but I'm not allowed to let you talk to her or see her . . . ." Grandmother testified:

> We would call and we would ask can she come over, and it would be, no, not right now, she's busy or there would be another - - like Easter, have her come over and she would say, well, she can come over as long as [Father] is not there and don't let them talk on the phone, and I realized that she was like insecure over this. And when she would come over to the house, I'd literally open up the doors in my house, in the kitchen and the bedroom door's [sic] open, and we'd walk all through the house, you know, to the bedroom, so she could see he's not here. I'm not going to - - you know, worry about jeopardizing, not being able to see my granddaughter, you know. And we'd go, you know, into that. It got a little bit farther in.

Grandmother testified that in May of 2013 she and Mother either spoke or texted about the Child's upcoming recital. Grandmother testified: "[Mother said] please don't tell [Father], and I'm thinking, duh, I mean, who - - I mean, it's a - - all you have to do is listen to the radio and it tells you when the recitals are, you know, with these things and stuff. And he already knew about it anyway."

Grandmother testified that she heard the Child refer to Step-father as 'dad' shortly before Mother and Step-father were married. Grandmother testified that a little over a year prior to trial and after Mother and Step-father were married, Grandmother was with the Child, and the Child was writing her name on a chalkboard. The Child wrote her last name as Step-father's last name. Grandmother asked the Child why she wrote that, and the Child told Grandmother that was going to be her new name.

Grandmother was asked about the complications that arose with transporting the Child, and she stated:

> It was because it seemed like we were doing it all the time. I was, or my husband was the ones that were going back and forth, and it was just

getting costly. And then it was hard to get my job to regulate with it. So that's when we asked if - - why can't she just wait there at the studio [where Father works] for us and I will be right there, pick her up on the way through or something. I just - - it was getting harder and harder to go over there.

After trial the Trial Court entered its order on July 7, 2014[2] dismissing the petition after finding and holding, *inter alia*, that Mother and Step-father failed to prove by clear and convincing evidence that Father willfully failed to visit the Child and failed to prove by clear and convincing evidence that Father willfully failed to pay support for the Child.[3] Mother and Step-father appeal the dismissal of their petition to this Court.

## Discussion

Although not stated exactly as such, Mother and Step-father raise three issues: 1) whether the Trial Court erred in finding that Mother and Step-father failed to prove by clear and convincing evidence that Father willfully failed to visit the Child; 2) whether the Trial Court erred in finding that Mother and Step-father failed to prove by clear and convincing evidence that Father willfully failed to pay support for the Child; and, 3) whether the Trial Court erred in failing to find that Mother and Step-father had proven by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of

---

[2] The order was entered *nunc pro tunc* to May 28, 2014.

[3] By order entered on December 10, 2014, the Trial Court certified its order with regard to the petition to terminate as a final order pursuant to Tenn. R. Civ. P. 54.02.

11

the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 WL 1660838, at *6 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court has instructed: "the clear and convincing evidence standard requires that the truth be highly probable. 'Clear and convincing evidence means evidence in which there is no serious or

substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Mother and Step-father sought to terminate Father's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1), which provides:

(g)  Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2014).  In pertinent part, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the a [sic] parent or parents or a guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the a [sic] parent or parents or a guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (2014).

We first consider whether the Trial Court erred in finding that Mother and Step-father failed to prove by clear and convincing evidence that Father abandoned the Child by willful failure to visit the Child.  The evidence in the record on appeal shows that Father exercised regular visitation with the Child averaging visits two nights per week for the first five years of the Child's life.  The evidence shows that the situation changed right around the time that Mother became engaged to Step-father.  The evidence in the record shows that although Mother insisted that Father go through her to schedule visitation,

13

Mother failed to provide Father with her telephone number or the address where Mother and the Child lived with Step-father. The evidence further shows that problems arose with regard to transporting the Child to visits with Father, and that Mother refused to allow the Child anywhere near Father's place of employment. Grandmother testified that meeting at Father's place of employment would have made transportation easier and Father testified that his place of employment was not an inappropriate place for the Child to be. The evidence shows no valid reason for Mother's refusing to allow the Child to be at Father's place of employment with Father. The evidence in the record also shows that Mother instructed Grandmother not to tell Father about the Child's recital.

Overall, the evidence shows that Mother took steps that made it much more difficult for Father to exercise visitation with the Child. Mother took unreasonable steps restricting Father's access to the Child such as prohibiting the paternal grandparents from allowing Father to see or talk to the Child when the Child visited the grandparents even though Father lived with them. As such, the evidence in the record on appeal does not support a finding that Father's failure to visit was willful. The evidence in the record on appeal does not preponderate against the Trial Court's finding that Mother and Step-father failed to prove by clear and convincing evidence that Father had abandoned the Child by willful failure to visit.

Next, we consider whether the Trial Court erred in finding that Mother and Step-father failed to prove by clear and convincing evidence that Father abandoned the Child by willful failure to pay support for the Child. As discussed above, the evidence in the record on appeal shows that Father paid child support in accordance with the signed written agreement he and Mother had for approximately the first five years of the Child's life. The evidence shows that the situation changed when Mother became engaged to Step-father. The evidence shows that Mother failed to provide Father with the mailing address where she and the Child resided, and, as discussed above, took steps which interfered with Father's visits with the Child resulting in Father being unable to give the child support directly to Mother when he exercised visitation as had been customary between the parties in the past. The evidence shows that Father attempted to send child support payments via certified mail to the address he obtained from the court file, but those certified letters were not accepted.

In essence, the evidence shows that Mother took successful steps that interfered with Father's ability to pay child support. As such, the evidence does not support a finding that Father's failure to pay child support was willful. We find no error in the Trial Court's finding that Mother and Step-father failed to prove by clear and convincing evidence that Father abandoned the Child by willful failure to pay child support.

14

As we have affirmed the Trial Court's findings that grounds for termination were not proven by clear and convincing evidence, we find no error in the Trial Court's refusal to make a determination regarding best interest. We affirm the Trial Court's July 7, 2014 order dismissing Mother's and Step-father's petition.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Rachel L.S. and Brandon M.R. and their surety.

_____
D. MICHAEL SWINEY, JUDGE