FILED
07/31/2024
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 1, 2023 Session

## PEGGY MATHES ET AL. v. 99 HERMITAGE, LLC

**Appeal by Permission from the Court of Appeals
Chancery Court for Davidson County
No. 17-52-IV        Russell T. Perkins, Chancellor**

_____

**No. M2021-00883-SC-R11-CV**
_____

This appeal raises a thorny question about adverse possession. Under that doctrine, a party may gain legal title or a defensive possessory right to real property by maintaining exclusive, actual, adverse, continuous, open, and notorious possession of the property for a certain length of time. At issue here is the adversity requirement. The original plaintiff in this case, Ora Eads, Jr., obtained legal title to a commercial property near downtown Nashville years ago but did not register the deed. About two decades later, the individual who sold the property to Mr. Eads defaulted on a loan, and his creditor obtained a judgment lien against the property, which was eventually sold to enforce the lien. Plaintiffs argue that Mr. Eads adversely possessed the property during the intervening years. Defendant, the subsequent purchaser of the property, disagrees and argues that Mr. Eads's possession was not adverse. We agree with defendant. Adversity, for purposes of both common-law and statutory adverse possession, requires either a conflict of title or a controversy about the right to possess the property. Because neither existed here for the requisite time period, we reverse the Court of Appeals' contrary decision and reinstate the chancery court's judgment in favor of defendant.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed; Judgment of the Chancery Court Reinstated**

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which SHARON G. LEE, JEFFREY S. BIVINS, and ROGER A. PAGE, JJ., joined. HOLLY KIRBY, C.J., filed a dissenting opinion.

Charles Michels, L. Gino Marchetti, Jr., and Matthew C. Pietsch, Nashville, Tennessee, for the appellant, 99 Hermitage, LLC.

James C. Bradshaw III and Frank H. Reeves, Nashville, Tennessee, for the appellees, Peggy Mathes, Administratrix C.T.A. of the Estate of Ora W. Eads, Jr.; Judith L. Carter and Charles M. Duke, Co-Administrators of the Estate of Eleanor L. Eads; Judith L. Carter; Jesse Leegon; Charles Leegon; and Robert Leegon.

## OPINION

### I.

To understand the legal issue in this appeal, some background about adverse possession and the registration of legal instruments is necessary.

### A.

The doctrine of adverse possession has roots in English and Roman law and has been part of Tennessee's jurisprudence for over two centuries. *See, e.g.*, *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 376 (Tenn. 2007); Allen Shoffner, *Title by Adverse Possession in Tennessee*, 5 Vand. L. Rev. 621, 623–24 (1952). The doctrine is of statutory origin. *See* Shoffner, *supra*, at 621; *see also* Jeffrey Evans Stake, *The Uneasy Case for Adverse Possession*, 89 Geo. L.J. 2419, 2421 & n.11 (2001). As early as thirteenth-century England, statutes were passed limiting the time in which a property owner could bring an action to recover possession of the property. Stake, *supra*, at 2421 & n.11 (tracing adverse possession to the Statute of Westminster in 1275).

Tennessee's legislature enacted statutory adverse possession provisions in 1819. *See* Act of November 16, 1819, ch. 28, § 1, 1819 Tenn. Pub. Acts 53, 53–54 (codified as amended at Tenn. Code Ann. § 28-2-101 (1980)); *see also* Shoffner, *supra*, at 623–27. "[I]ndependently of the statutory limitations, and in analogy to the doctrine of prescription," Tennessee courts also developed what is now known as common-law adverse possession. Shoffner, *supra*, at 628. Under the doctrine of common-law adverse possession, a court presumes that a possessor has a grant or deed if he or she has remained in uninterrupted and continuous possession of land for a certain time period. *Id.*

Several justifications have been offered for statutory and common-law adverse possession. The principal justification is to provide certainty of title. *See* Henry W. Ballantine, *Title by Adverse Possession*, 32 Harv. L. Rev. 135, 135 (1918) ("[T]he great purpose [of adverse possession] is automatically to quiet all titles which are openly and consistently asserted, to provide proof of meritorious titles, and correct errors in conveyancing."); *see also* Act of November 16, 1819, ch. 28, pmbl., 1819 Tenn. Pub. Acts 53) (providing that the Act was meant for "quieting the citizens of this state in their possessions, and to prevent litigation"). Other justifications include stabilizing uncertain

boundaries, promoting "respect for the apparent ownership of the adverse possessor who transfers his interest," and encouraging productive use of land. *Cumulus*, 226 S.W.3d at 376; *see also* Matthew Sipe, *Jagged Edges*, 124 Yale L.J. 853, 854 (2014) (noting that adverse possession may result in "higher-valued uses for individual parcels of land" or "reduce[] transaction costs for the property market as a whole").

This case involves claims of both statutory and common-law adverse possession.

Statutory forms of adverse possession now appear in Tennessee Code Annotated sections 28-2-101 through -103, and -105. *See Cumulus*, 226 S.W.3d at 376; Chancellor Telford E. Forgety Jr. et al., *Fortify Thyself*, 48 Tenn. B.J. 14, 19–20 (2012). The provision at issue in this case is section 28-2-103. It provides that "[n]o person or anyone claiming under him shall have any action, either at law or in equity, for the recovery of any lands, tenements or hereditaments, but within seven (7) years after the right of action accrued." Tenn. Code Ann. § 28-2-103(a) (1980).[1] Subsection (b) of that same section limits the adverse possessor's claim to what he or she actually possesses, "until the muniment of title, if any, . . . is duly recorded in the county in which the lands are located." *Id.* § 28-2-103(b); *see also Walsh v. Tipton*, 190 S.W.2d 294, 300–02 (Tenn. 1945) (holding that, in the absence of color of title, a possessor is protected to the extent of actual enclosures).

Section -103 is "defensive only, barring only the remedy." *Cumulus*, 226 S.W.3d at 376. In other words, it "may be utilized by the adverse holder only in the defense of a suit" and not to establish legal title to the property. *Id.*; *see also Kittel v. Steger*, 117 S.W. 500, 503 (Tenn. 1909)*.* In contrast to other forms of statutory adverse possession, section -103 does not require the possessor to hold assurance or color of title. *See Shearer v. Vandergriff*, 661 S.W.2d 680, 682 (Tenn. 1983).

Common-law adverse possession requires uninterrupted and continuous possession of land for twenty years but, like section -103, does not require assurance or color of title. *Cumulus*, 226 S.W.3d at 376–77. When the twenty-year threshold is met, legal title to the property vests in the possessor. *Id.* at 377.

Both forms of adverse possession—statutory and common-law—require possession for the requisite time period that is "exclusive, actual, adverse, continuous, open, and notorious." *Id.*

---

[1] Citations are to the 1980 edition of the Tennessee Code Annotated because plaintiffs argue that Mr. Eads's statutory adverse possession rights vested in 1998. But there are no material differences between the 1980 version and the current version of section 28-2-103. *See* Tenn. Code Ann. § 28-2-103(a) (2017) ("No person or anyone claiming under such person shall have any action, either at law or in equity, for the recovery of any lands, tenements or hereditaments, but within seven (7) years after the right of action accrued.").

## B.

This case also implicates Tennessee's statutes governing the registration of deeds. Tennessee Code Annotated section 66-24-101 lists various instruments that are eligible for registration. Included in this list are "[a]ll deeds for absolute conveyance of any lands, tenements or hereditaments, or any estate therein" and "all other deeds of every description." Tenn. Code Ann. § 66-24-101(a)(4), (12) (1982 & Supp. 1990). The instruments listed in section -101 serve as "notice to all the world from the time they are noted for registration . . . and . . . take effect from said time." *Id.* § 66-26-102 (1982).

Tennessee's registration statutes have existed for nearly two centuries. *See Wilkins v. McCorkle*, 80 S.W. 834, 837 (Tenn. 1904). The purpose of these statutes is to "give notice of the position and change of titles to property, as well as all incumbrances upon it," so as to protect purchasers and inform creditors. *Ruggles v. Williams*, 38 Tenn. (1 Head) 141, 143 (1858); *see also* Tenn. Code Ann. § 66-26-102 (2022) ("All of the instruments registered . . . shall be notice to all the world . . . ."); *Blevins v. Johnson Cnty.,* 746 S.W.2d 678, 684 (Tenn. 1988) ("The object of registration is to give notice to creditors and subsequent purchasers." (quoting *Moore v. Cole*, 289 S.W.2d 695, 698 (Tenn. 1956))); P.H. Marshall, *A Historical Sketch of the American Recording Acts*, 4 Clev. St. L. Rev. 56, 64 (1955) (explaining that early recording acts enabled colonists to "point to . . . public documents in case of a land dispute or fraudulent claim and determine by the facts so recorded which party would prevail" and also protected bona fide purchasers "from a prior grantee who negligently had failed to record his title, which right if recorded would have served as notice to all the world as to his prevailing right to the land").

The effectiveness of a deed that is not registered turns on the parties at issue. An unregistered deed is effective "between the parties to the [instrument], and their heirs and representatives." Tenn. Code Ann. § 66-26-101 (1982). "As between the parties" to a conveyance, "registration of the deed [is] unimportant." *McCorkle*, 80 S.W. at 836. Legal title passes from the grantor to the grantee when the deed is executed, regardless of whether the deed is registered. *Id.* (explaining that as "between [the vendor] and his vendee the divestiture of title was as complete as if registration had taken place"); *see also, e.g.*, *Campbell v. Home Ice & Coal Co.*, 150 S.W. 428, 429 (Tenn. 1912); *Wilkins v. May*, 40 Tenn. (3 Head.) 173, 176 (1859); *Shields v. Mitchell*, 18 Tenn. (10 Yer.) 1, 8 (1836); *Hays v. McGuire*, 16 Tenn. (8 Yer.) 92, 101 (1835); *Vance's Heirs v. McNairy*, 11 Tenn. (3 Yer.) 171, 176–77 (1832).

But an unregistered deed is ineffective "as to other persons, not having actual notice of [the deed]." Tenn. Code Ann. § 66-26-101 (1982); *see also Hays*, 16 Tenn. (8 Yer.) at 101 (explaining that, "as between the parties, their heirs and representatives," an unregistered deed "is good, and passes the title without registration, saving the rights of

- 4 -

strangers, creditors, and *bona fide* purchasers"). In particular, an unregistered deed is "null and void as to existing or subsequent creditors of, or bona fide purchasers from, the makers without notice." Tenn. Code Ann. § 66-26-103 (1982).

In this sense, an individual holding an unregistered deed is said to have an "inchoate" legal title, with registration required "to perfect the title at law." *Hays*, 16 Tenn. (8 Yer.) at 101; *see also May*, 40 Tenn. (3 Head.) at 176; *Shields*, 18 Tenn. (10 Yer.) at 8; *McNairy*, 11 Tenn. (3 Yer.) at 176. Before registration, the deed is "good only between the parties and their privies, and persons having notice of them." *McCorkle*, 80 S.W. at 837. After registration, the grantee's title is "said to become 'perfect,' because [it is] then good as to all the world from that time." *Id.* Although registration is required to perfect the grantee's title, no title remains in the grantor after the deed is conveyed. *Shields*, 18 Tenn. (10 Yer.) at 8. As we explained in *Shields*, the execution of the deed "divest[s] [the grantor] of his legal estate" and "no title, legal or equitable, remains in him." *Id.* Even if the deed is never registered, legal title "does not revest in the [grantor]." *Id.*

## II.

With that legal background in mind, we turn to the rather complicated facts of this case and its procedural history.

## A.

In July 1984, Ora Eads, Jr., and Gary Duplex incorporated Brake-Tech, Auto Brake Centers, Inc., as a Tennessee corporation with its principal office at 99 Hermitage Avenue, a commercial property near downtown Nashville. Raymond Whiteaker, Jr., owned the property at that time. At the time of incorporation, Mr. Duplex was the President of Brake-Tech, and he and Mr. Eads each owned fifty percent of Brake-Tech's stock. But Mr. Duplex soon left Brake-Tech and transferred his shares to Mr. Eads, who became the sole shareholder.

On July 7, 1986, Mr. Eads and his wife Eleanor Eads, on behalf of Brake-Tech, entered an installment deed to purchase the property at 99 Hermitage Avenue from Mr. Whiteaker for $125,000 in sixty installments. Both Mr. and Mrs. Eads signed the corresponding promissory note. The next day, Mr. Whiteaker issued the deed for the property to Brake-Tech. Mr. and Mrs. Eads each signed the deed individually, and Mr. Eads also signed as President of Brake-Tech.

The secured note held Mr. and Mrs. Eads jointly and severally liable for the installment payments. According to the deed, title to the property was transferred to a trustee until the payments were completed. If the Eadses fully paid the purchase price of

the property and complied with the terms of the deed, then the "trust conveyance [would] be of no further force or effect." Under the terms of the deed, the Eadses were required to pay taxes, maintain and repair the property, and keep it insured.

About two years later, in 1988, Brake-Tech was administratively dissolved and its charter was revoked. The next year, the Eadses jointly filed for Chapter 11 bankruptcy, listing 99 Hermitage Avenue in their bankruptcy petition.

Before the bankruptcy terminated on February 7, 1991, the Eadses paid the remaining balance of the promissory note. The Eadses had fully complied with the terms of the deed. The promissory note contained a hand-written notation signed by Mr. Whiteaker stating that the note had been paid in full on December 28, 1990.

After the note was paid, Mr. Whiteaker gave the deed to 99 Hermitage Avenue to Mr. Eads. But Mr. Eads put the deed away and forgot to record it.

Starting in 1986, Mr. Eads had access to the building located on the property directly, through employees of Brake-Tech, or through his tenants. From 1987 to 2011, he leased the property to tenants. When the property was not occupied by tenants, he used it for storage and an office space. Various checks were issued from the Eadses' joint account to improve the property. And all property taxes were paid from the same joint account.

At some point while Mr. Eads was in possession of the property at 99 Hermitage Avenue, Mr. Whiteaker and several others entered a Florida real-estate transaction. As part of this transaction, they executed loan documents and a promissory note. SPCP Group, LLC, held all right, title, and interest in the loan documents, including the note. Mr. Whiteaker and the other parties to the transaction subsequently failed to meet their obligations under the loan documents. Because of the default, SPCP obtained a Florida judgment against Mr. Whiteaker in 2008 for $1,901,980.38. The following year, in September 2009, the Florida judgment was domesticated by the Davidson County Circuit Court and then registered as a judgment lien against Mr. Whiteaker's real property of record in Davidson County.

On June 17, 2016, SPCP brought an action against the administrator of Mr. Whiteaker's estate, Matt Potempa; Mr. Whiteaker's two heirs; and The Raymond C. Whiteaker Revocable Trust, which was a potential beneficiary of Mr. Whiteaker's estate, to enforce the lien and sell 99 Hermitage Avenue.[2] Several months later, the Davidson

---

[2] Mr. Whiteaker passed away on April 9, 2014. After Mr. Whiteaker's will was admitted to probate and Mr. Potempa was appointed as administrator, Mr. Potempa filed an initial inventory of the estate's assets. That inventory did not list any real property.

County Chancery Court entered an order authorizing the sale of the property. And soon after that, an entity named 99 Hermitage, LLC, purchased the judgment lien from SPCP.

On November 8, 2016, Mr. Potempa, accompanied by law enforcement officers, entered the building located at 99 Hermitage Avenue and had the locks changed. About a week later, on November 16, 2016, Mr. Eads recorded the deed he had received years earlier from Mr. Whiteaker as well as a deed he had executed on behalf of Brake-Tech that quitclaimed 99 Hermitage Avenue to Mr. and Mrs. Eads individually.[3] In December 2016 and January 2017, the Davidson County sheriff published a notice of sale. And on January 19, 2017, 99 Hermitage, LLC, purchased the property at the sheriff's sale for $800,000.

B.

The day before the sheriff's sale, Mr. and Mrs. Eads brought this action against 99 Hermitage, LLC, in Davidson County Chancery Court.[4] The operative complaint alleged that the Eadses had satisfied the requirements for both statutory adverse possession under Tennessee Code Annotated section 28-2-103 and common-law adverse possession. The complaint sought a judgment declaring that either Mr. Eads or the Eadses jointly are "the owners of [99 Hermitage Avenue], free and clear of any claims thereto by any other party in this action." It also sought a judgment declaring that 99 Hermitage, LLC, "ha[s] no right of action or claim against either Mr. or Mrs. Eads with respect to the Property." Defendant asserted counterclaims for trespass and ejectment.

The chancery court denied or held in abeyance various dispositive motions filed by defendant, and the case eventually proceeded to a bench trial in October 2018.[5]

Defendant asserted that plaintiffs could not establish adverse possession because "[a] party in possession of real property, holding an unrecorded deed from the owner of the property as set forth in the public records, does not and cannot hold the real property adversely to the record owner." Defendant cited as authority for this assertion the Tennessee Court of Appeals' opinion in *Milledgeville United Methodist Church v. Melton*,

---

[3] Plaintiffs do not rely on the deed itself as a basis for claiming ownership or a possessory interest in the property. Nor do they assert that 99 Hermitage, LLC, had disqualifying notice of their possession of the property. The only issue before us is adverse possession.

[4] The original complaint also named as defendants SPCP and Mr. Potempa, in his sole capacity as the administrator of Mr. Whiteaker's estate. Plaintiffs voluntarily dismissed their claims against SPCP and Mr. Potempa by separate orders entered on May 9, 2017, and October 6, 2017, respectively.

[5] Mr. Eads passed away in January 2018, several months before the trial. Mrs. Eads passed away in August 2020, before the chancery court issued its opinion and final judgment. Following their deaths, the administrators of the estates of Mr. and Mrs. Eads and Mrs. Eads's heirs were substituted as plaintiffs.

388 S.W.3d 280 (Tenn. Ct. App. 2012), and argued that the chancery court was bound by that opinion.

Plaintiffs disagreed. They maintained that—regardless of the unrecorded deed—Mr. Eads had adversely possessed the property continuously since February 7, 1991, when the Eadses' bankruptcy ended, and thus had satisfied both the twenty-year period of possession required for common-law adverse possession and the seven-year period required under Tennessee Code Annotated section 28-2-103. Plaintiffs countered that the portion of *Milledgeville* cited by defendant is dicta and contrary to this Court's decisions in *Kittel*, 117 S.W. 500; *City National Bank & Trust Co. of Miami v. City of Knoxville*, 11 S.W.2d 853 (Tenn. 1928); and *Moore v. Dinning*, 13 S.W.2d 798 (Tenn. 1929).

The chancery court concluded that plaintiffs had failed to establish adverse possession and granted final judgment in favor of defendant as to both the plaintiffs' affirmative claims and the defendant's counterclaims. The court reasoned that "[t]he 'golden thread' running through *Milledgeville*, *Moore* and other adverse possession precedent appears to be that a case-by-case factual review is contemplated." The court noted that "no Tennessee appellate court has definitively determined that a person holding property under an installment deed (fully paid or not) is necessarily barred from adversely possessing the property which is the subject of the installment deed," and that "no appellate court appears to have held, as a matter of law, that a party in the foregoing situation is automatically deemed to be possessing the property adversely, or in hostility to, the grantor." After reviewing the facts, the court concluded that defendant was entitled to protection under Tennessee Code Annotated sections 66-26-101 and -103 "[a]s a bona fide purchase[r] without notice" and that plaintiffs could not assert adverse possession against Mr. Whiteaker, the "true record owner," because of "the permissive nature of the relationship" between Mr. Whiteaker and Mr. Eads. The court pointed to "the Deed, the installment note, the apparent understanding that Mr. Whiteaker would hold the Deed pending full payment, and the fact that Mr. Whiteaker delivered the Deed and a handwritten acknowledgement of payment in full to Mr. Eads." The court determined that Mr. Whiteaker "acquiesced in Mr. Eads' conduct in renting out the Property, without making any demand," noting that the property "was wholly commercial property near downtown Nashville, not some forgotten sliver of property subject to boundary uncertainties or mistakes."

The Court of Appeals reversed. *See Mathes v. 99 Hermitage, LLC*, No. 2021-00883-COA-R3-CV, 2022 WL 2446340 (Tenn. Ct. App. July 6, 2022), *perm. app. granted*, (Tenn. Dec. 15, 2022). In its view, Tennessee Supreme Court precedent, including *City of Knoxville* and *Moore*, established that "adverse possession is a tenable theory that grantees possessing land under an unrecorded deed may assert to overcome competing interests from third parties." *Id.* at *3–5. The Court of Appeals found nothing "to support a

conclusion that Mr. Eads' possession during the period at issue was with the permission of anyone." *Id.* at *6. Accordingly, it held that Mr. Eads acquired title to the property by common-law adverse possession. *Id.* at *1.

We granted defendant's application for permission to appeal. That application raised two issues. We decide only the first: whether a grantee who obtained legal title to property through the transfer of a valid deed but failed to register the deed may satisfy the adversity requirement for statutory or common-law adverse possession.[6]

## III.

Adverse possession ordinarily is a question of fact. *See Cumulus*, 226 S.W.3d at 377. The burden of proof falls on the individual claiming ownership by adverse possession to establish the elements by clear and convincing evidence. *Id.*; *see also Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005) (stating that clear and convincing evidence requires that truth of the facts asserted be "highly probable"). But the specific question presented in this case—whether certain facts may establish the adversity element of adverse possession—is a question of law that we review de novo. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). We review the trial court's findings of fact after a bench trial "de novo upon the record with a presumption of correctness, 'unless the preponderance of the evidence is otherwise.'" *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017) (quoting Tenn. R. App. P. 13(d)).

## IV.

Both statutory and common-law adverse possession require "exclusive, actual, adverse, continuous, open, and notorious" possession for a certain period of time. *Cumulus*, 226 S.W.3d at 376–377. Plaintiffs maintain that Mr. Eads satisfied these requirements from February 7, 1991 (when the Eadses' bankruptcy proceedings concluded), to November 8, 2016 (when Mr. Potempa and others entered the property and changed the locks). Plaintiffs therefore contend that Mr. Eads gained a defensive possessory right to the property under Tennessee Code Annotated section 28-2-103 on February 11, 1998 (seven years after adverse possession began), and gained title to the property under common-law adverse possession on February 7, 2011 (twenty years after adverse possession began).

The dispute here centers on whether Mr. Eads's possession of the property during the relevant time period was "adverse." Defendant says it was not. Adversity, defendant

_____

[6] Defendant's Rule 11 application also presented the question "[w]hether an inchoate common law adverse possession claim supersedes a valid, recorded judgment, attachment, order, injunction or other writ affecting title, use or possession of real estate." Because we conclude that plaintiffs' claim of adverse possession fails, we need not reach that issue.

maintains, requires possession of the property against the *true owner*, and, here, the true owner of the property was Mr. Eads, not Mr. Whiteaker. In support of its position, defendant relies principally on the Court of Appeals' decision in *Milledgeville*, 388 S.W.3d 280, as well as earlier Tennessee decisions indicating that adversity requires possession that is hostile to the true owner.

Plaintiffs maintain that Mr. Eads's unregistered deed does not undermine his claim of adverse possession. According to plaintiffs, Mr. Eads possessed the property adversely to both Mr. Whiteaker—the record owner of the property—and any party claiming through Mr. Whiteaker, including defendant and SPCP. They take the position that, because Mr. Eads's deed was unregistered, Mr. Whiteaker remained the "true owner" of the property in the eyes of Mr. Whiteaker's creditors and all others except the parties to the deed. As for *Milledgeville*, plaintiffs contend that the Court of Appeals' discussion concerning adverse possession was mere dicta, and in any event that it contravenes *City of Knoxville* and other precedents involving claims of adverse possession by parties with unregistered deeds.

We begin by examining our precedents concerning the adversity requirement and claims of adverse possession by parties with unregistered deeds. We conclude that our precedents are best read as requiring for adversity either a conflict of title or a controversy regarding the right of possession, and we overrule *City of Knoxville* to the extent it is inconsistent with that rule. Based on this understanding of the adversity requirement, we hold that Mr. Eads did not gain title to the property or a defensive possessory right to the property through adverse possession because there was no conflict of title or controversy regarding the right of possession throughout the claimed periods of adverse possession. Although it is possible for the holder of an unregistered deed to satisfy the adversity requirement in some circumstances—for example, when someone other than the grantor claims title to the property—those circumstances did not exist here for long enough to establish adverse possession.

A.

This issue in this case proves difficult because our precedents point in two different directions. This Court has long held that adversity requires a conflict of title or a controversy regarding the right of possession. But we also held, in *City of Knoxville*, that a party holding an unregistered deed satisfied the requirements for adverse possession, even when no such conflict or controversy existed. 11 S.W.2d at 854. We first discuss our precedents concerning adversity generally and then turn to *City of Knoxville* and other precedents cited by plaintiffs.

- 10 -

We have long held that the adversity element of adverse possession requires a conflict of title or a controversy regarding the right of possession. As early as 1832, we explained that statutory adverse possession under a statutory predecessor to Tennessee Code Annotated section 28-2-103 requires that "possession was taken under a claim *hostile to the real owner*." *Dyche v. Gass' Lessee*, 11 Tenn. (3 Yer.) 397, 401–02 (1832) (emphasis added). The following decade, examining the same statute, we explained that if "possession is consistent with, or subordinate to, the title of another, there can be no confl[i]ct of title, or controversy as to the right of possession," and the party in possession therefore "would not require the aid of the statute either to perfect his title or protect his possession." *Story v. Saunders*, 27 Tenn. (8 Hum.) 663, 669–70 (1848). In a later case, we deemed it "essential to the defense" of statutory adverse possession "that the possession shall be upon the conflict between the titles." *Byrd v. Phillips*, 111 S.W. 1109, 1112 (Tenn. 1908) (citing *Napier's Lessee v. Simpson*, 1 Tenn. (1 Overt.) 448, 453 (1809) ("Possession of land, so as to produce a bar, must be an actual possession of some part in dispute.")). Numerous other cases require possession adverse to the true owner of the property. *See, e.g.*, *Irvine's Heirs v. McRee*, 24 Tenn. (5 Hum.) 554, 555 (1845) ("When a party relies upon his possession only, to *resist the right of the true owner of land*, he must show, by clear proof, his actual occupancy continued, uninterrupted, and adverse for the time required by the statute of limitations." (emphasis added)); *Stewart v. Harris*, 28 Tenn. (9 Hum.) 714, 716–17 (1849) (explaining that a party "must show an actual possession of some part of the land in dispute and that such possession was . . . *adverse to the title of the proper owner, and all others*" (emphasis added)); *Sequatchie Val. Coal & Iron Co. v. Coppinger*, 32 S.W. 465, 466 (Tenn. 1895) (holding "that defendant has not had such adverse possession as the law requires to give him a good *possessory right as against the holder of the true title*" (emphasis added)); *Bensdorff v. Uihlein*, 177 S.W. 481, 483 (Tenn. 1915) ("The idea underlying the whole doctrine of adverse possession is that the possession should be maintained in an open and notorious manner, so as to *warn the true owner that a hostile claim is being asserted* to his land." (emphasis added)); *Drewery v. Nelms*, 177 S.W. 946, 947–48 (Tenn. 1915) ("The doctrine of adverse possession is to be taken strictly, and must be made out by clear and positive proof and not by inference, every presumption being in favor of a possession in subordination to the *title of the true owner*." (emphasis added)).[7]

Aligning with this understanding of adversity, we have held that the requirements for adverse possession are not satisfied when the possessor's interest in the property is

---

[7] Treatises make the same point. *See, e.g.*, Herbert Thorndike Tiffany, *Law of Real Property and Other Interests in Land* § 503 (3d ed. 1920) (explaining that possession must "be 'adverse' or 'hostile' to the true owner"); William Wait, *Treatise Upon Some of the General Principles of the Law, Whether of a Legal, or of an Equitable Nature, Including Their Relations and Application to Actions and Defenses in*

consistent with or subservient to another's interest. *See, e.g.*, *Graham's Heirs v. Nelson's Heirs*, 24 Tenn. (5 Hum.) 605, 610 (1845) (holding that defensive adverse possession statute was not intended to apply to cases in which "the party against whom the suit is brought has been holding in subservience to the complainants' right, and his possession has been consistent therewith"); *Bd. of Educ. of Memphis City Schs. v. Shelby Cnty.*, 292 S.W. 462, 464 (Tenn. 1927) (holding that the defense of adverse possession could not be asserted by one governmental agency against another because "[i]n the execution of a state purpose neither the board of education nor the county has any interest adverse to the other"); *West v. Moore*, 246 S.W.2d 74, 77 (Tenn. 1952) (explaining that "a life tenant under an instrument cannot hold adversely to persons named remaindermen in that instrument").

The proposition that adversity requires a conflict of title or a controversy regarding possession finds further support in cases discussing when the statutory adverse possession period begins to run. Recall that section 28-2-103 limits the time period for bringing an action to recover lands to seven years "*after the right of action accrued*." Tenn. Code Ann. § 28-2-103(a) (emphasis added); *see also Moffitt v. Meeks*, 199 S.W.2d 463, 465 (Tenn. Ct. App. 1946) ("It is well settled that [defensive adverse possession] begins to run when the right of action accrues."). This limitations period begins when an adverse claim "has been accompanied with an actual possession thereof, in exclusion of and in hostility to the claimant" and that "[i]t is the invasion of the owner's rights by an actual visible possession of the land, with intent to claim it against the owner, that lays *the only proper foundation* for the operation of the statute." *Smith v. Lee*, 41 Tenn. (1 Cold.) 549, 552 (1860) (emphasis added); *see also* Herbert Thorndike Tiffany, *Law of Real Property and Other Interests in Land* § 506 (3d ed. 1920) (noting that statutes of limitation for adverse possession "do not commence to run as against a particular person until a right of entry or action accrues to him"). If the statutory adverse possession period does not begin to run until another's right of action accrues, then adversity necessarily requires a conflict of title or controversy regarding the right of possession sufficient to give rise to a cause of action in the first place.

About a decade ago, the Court of Appeals relied on this understanding of the adversity requirement in *Milledgeville* to reject a claim of adverse possession by a church that held legal title to a property but had failed to record the deed. 388 S.W.3d at 287–88. The church purchased the property from a bank in 1974 and received a warranty deed but neglected to record it. *Id.* at 282. In 2008, due to a clerical error, the bank sold the same property to an investor who recorded the deed. *Id.* at 283. The investor then sent a letter to the church asking it to remove a brick wall on the property, but the church did not comply.

---

*General* 437 (1885) (explaining that possession must be "adverse to the right of the true owner"); H.G. Wood, *Treatise on the Limitations of Actions at Law and in Equity* 510 (1883) ("[I]t is an indispensable requisite that the entry and possession, or the possession where the entry is not wrongful, should be hostile to the true owner[.]").

*Id.* After the investor entered the property and removed a portion of the wall, the church sued to quiet title and for damages. *Id.* at 282–83. During the course of litigation, the church recorded its deed. *Id.* at 283.

The Court of Appeals concluded that the church had legally purchased the property from the bank and was the rightful owner of the property during the claimed period of adverse possession. *Id.* at 287. The court thus rejected the church's claim of adverse possession, holding that "the Church's possession of the disputed land was not adverse to the true owner," *id.* at 288, because the church could not "adversely possess against [its] own interest in the land," *id.* at 287 (quoting *Holley v. Haehl*, No. M1999-02105-COA-R3-CV, 2000 WL 1292291, at *3 (Tenn. Ct. App. Sept. 14, 2000)). The court explained that "[a] party claiming ownership by adverse possession 'must sustain the proposition that the possession was in fact adverse to the true owner.'" *Id.* at 287 (quoting *Bynum v. Hollowell*, 656 S.W.2d 400, 403 (Tenn. Ct. App. 1983)). Although the court held that the church had not adversely possessed the property, it nevertheless held that the church's deed to the property had priority over the investor's deed based on Tennessee's race-notice statutes—specifically, Tennessee Code Annotated section 66-26-105 (2004)—because the investor, despite having the earlier-recorded deed, had inquiry notice of the church's unrecorded deed. *Id.* at 289–91.

2.

Our 1928 decision in *City of Knoxville* is in tension with our traditional understanding of the adversity requirement. *City of Knoxville* involved a declaratory judgment action to determine "the relative rights of a judgment creditor of J.T. Toms and of a vendee of said Toms under an unregistered deed with respect to land in Knoxville." 11 S.W.2d at 853. Toms conveyed a lot to the city of Knoxville in 1918. *Id.* The city immediately possessed the lot but failed to record the deed. *Id.* In 1926, a bank loaned money to Toms. *Id.* Toms failed to repay the loan. *Id.* The following year, the bank obtained a judgment against Toms, and, the year after that, a levy was placed on the lot that the city then possessed. *Id.* at 853–54.

We held that the city had a possessory right to the land under the Acts of 1819, chapter 28, section 2—a predecessor to section 28-2-103—and that "the bank ha[d] no lien upon the land . . . by reason of the judgment and levy of execution which takes priority over the city's possessory right to said land." *Id.* at 854. We acknowledged that "[a]n unregistered deed is held void as against creditors of the vendor, notwithstanding they are creditors subsequent to such deed and have actual knowledge thereof." *Id.* But we reasoned that this did not help the bank, because the city's right to hold the land at issue did not "depend on the deed so long as its possession [wa]s maintained." *Id.* "The possessory right of the city," we explained, was "complete by reason of the statute without any deed at all."

*Id.* We did not expressly address whether the city had satisfied the adversity element of its statutory adverse possession claim. But we held that the city had established a possessory right to the land under the adverse possession statute, notwithstanding the apparent lack of a conflict of title or controversy regarding possession during the relevant time period.

Plaintiffs contend that we would need to overrule at least two other precedents to reject Mr. Eads's claim of adverse possession: *Kittel*, 117 S.W. 500, and *Moore*, 13 S.W.2d 798. We disagree because both cases are distinguishable from the situation presented here.

In *Kittel*, an individual who had previously gained title to certain property through adverse possession brought a claim for ejectment against an individual who had been in possession of part of that property for more than seven years. 117 S.W. at 502. The defendant in the ejectment action invoked the Act of 1819, chapter 28, section 2 as a defense to the action and relied on an unregistered deed to support his statutory adverse possession claim. *Id.*

As relevant here, the question before the Court in *Kittel* was whether "the fact of nonregistration" prevented the defendant from establishing a claim of adverse possession under Act of 1819, chapter 28, section 2. *Id.* Confusion had arisen because the Act of 1819, chapter 28, *section 1*—now codified at Tennessee Code Annotated sections 28-2-101 and -102[8]—had been amended to preclude the vesting of title by adverse possession under those sections unless the "conveyance, devise, grant or other assurance of title" under which the claim of adverse possession was made was "recorded in the register's office." *Id.* The Court clarified that registration was *not* required under section 2. *Id.* at 503.

At first glance, *Kittel* seems to support plaintiffs' position in this case because an individual holding an unregistered deed was allowed to establish a claim of statutory adverse possession under the predecessor to section 28-2-103. On closer examination, however, *Kittel* is easily distinguished. Although the defendant in *Kittel* relied on an unregistered deed to support his claim of adverse possession, a conflict of title existed from the outset of the defendant's possession of the land. We explained that the plaintiff in the

---

[8] Section 28-2-101 provides that any person who adversely possesses property "granted by this state or the state of North Carolina" for seven years, with "holding by conveyance, devise, grant, or other assurance of title, purporting to convey an estate in fee, without any claim by action at law or in equity commenced within that time and effectually prosecuted against such person is vested with a good and indefeasible title in fee to the land described in such person's assurance of title." Tenn. Code Ann. § 28-2-101(a). To claim adverse possession under this section, the "conveyance, devise, grant, or other assurance of title shall have been recorded in the registers office . . . during the full term of such seven (7) years' adverse possession." *Id.* § 28-2-101(b). Section 28-2-102 provides that any person "neglecting for the term of seven (7) years to avail themselves of the benefit of any title, legal or equitable, by action at law or in equity, effectually prosecuted against the person in possession, under recorded assurance of title, as in § 28-2-101, are forever barred." *Id.* § 28-2-102 (1980).

ejectment action "had by operation of the statute of limitations acquired the title to the land in controversy, and that this was the status in 1899, when the [defendant] established an adverse possession upon said land." *Id.* at 502. We also noted that the plaintiff, through his earlier adverse possession, had "nullified" an intervening grant of property on which the defendant relied. *Id.* The Court did not expressly discuss the adversity requirement in *Kittel*, but the traditional requirements of a conflict of title or controversy regarding possession were satisfied throughout the claimed period of adverse possession.

In *Moore*, a man named J.H. Dinning sold a parcel of land to brothers W.T. and James Lockeridge in 1918 by executing a bond for title. 13 S.W.2d at 798. The Lockeridges soon took possession of the land and remained in possession until 1926. *Id.* In 1920, Dinning borrowed money from the Northwestern Insurance Company and secured the loan with several parcels of land, including the parcel he had sold to the Lockeridges. *Id.* The Lockeridges' bond for title had not yet been registered, and Dinning told the Northwestern Company at the time that the Lockeridges were only tenants. *Id.* The following year, Dinning executed and delivered to the Lockeridge brothers deeds conveying to each of them one-half of the parcel of land held under the bond for title, but the brothers failed to register the deeds. *Id.* at 798–99. In 1926, a judgment creditor of Dinning brought an action seeking to compel the sale of the land possessed by the Lockeridges to satisfy the judgment. *Id.* at 798. To defend against that action, W.T. Lockeridge, on behalf of himself and his brother's heirs, claimed statutory adverse possession under the predecessor to section 28-2-103. *Id.*

When the case arrived in this Court, it presented only one question: whether "the possession of lands by a vendee, holding under a *bond for title*, pending payment of the balance purchase money, [is] adverse to that of his vendor." *Id.* at 799. The Court of Appeals had held that the Lockeridges' possession of the property, as vendees under a bond for title, was not adverse to Dinning or his creditors because their entry and possession were in subordination to Dinning. *Id.* at 799. It further held that a vendee's possession would "retain[] its subordinate character until payment [of the bond], or until the vendee has distinctly and unequivocally repudiated the title of his vendor and has given the vendor notice to this effect." *Id.*

This Court disagreed. Citing earlier precedents, we held that a title-bond vendee in possession of the property holds it adversely to the vendor. *Id.* at 799–800. We explained that, if a title-bond vendee so holds the property for seven years, he is protected against any possessory action by the vendor or the vendor's creditors pursuant to Shannon's Code section 4458, a predecessor to section 28-2-103. *Id.* at 799–800. We noted the Court of Appeals' reliance on Shannon's Code section 4461, now codified at Tennessee Code Annotated section 28-2-108, which provides that "possession is not adverse within the meaning of this article . . . when taken and continued under a title-bond, mortgage or other

- 15 -

instrument acknowledging that right or interest, or when taken . . . in subordination to the right or interest of another." *Id.* at 800 (citing Shannon's Code, § 4461). But we explained that "this statute was only intended to enact that the possession of the purchaser shall not be adverse to the claim of the vendor's purchase money." *Id.* (internal quotation marks omitted). It did not prevent a vendee from establishing a possessory right to the property in reliance on the adverse possession statutes. *Id.*

*Moore* is not on all fours with this case either. In *Moore*, the party seeking to establish adverse possession was a title-bond vendee who had yet to finish making payments and therefore did not hold legal title to the property. Unlike Mr. Eads, the title-bond vendee was seeking to adversely possess the property against a vendor who still held legal title as between the vendee and vendor. Our conclusion in *Moore* that the title-bond vendee's possession was adverse to the vendor does not preclude us from holding that the adversity element is not satisfied here.[9]

B.

Although *City of Knoxville* is factually similar to this case, we decline to follow it because it conflicts with earlier precedents regarding the adversity requirement. Notably, *City of Knoxville* did not acknowledge our precedents requiring a conflict of title or a controversy regarding the right of possession, let alone explain how such a conflict or controversy existed in that case. The Court cited our decision in *Dyche*, but only for the proposition that "a naked trespasser who may have taken and held possession of land, or land of another adversely for seven years, without any color or pretense of right, is protected in that possession to the extent of his inclosures." 11 S.W.2d at 854 (citing *Dyche*, 11 Tenn. (3 Yer.) at 397).

The Court in *City of Knoxville* seemed troubled by the possibility that a mere trespasser could establish adverse possession while the rightful owner of property who simply failed to record the deed could not. *See id.* But that was no reason to disregard or water down the traditional requirements for adversity. If it seems anomalous or unfair to treat a trespasser more favorably than an owner in this context, it must be remembered that Tennessee's recording statutes create a strong incentive to promptly record deeds. *See*

---

[9] Our holding in *Moore* that a title-bond vendee with payments remaining may adversely possess the property against the vendor appears to be an outlier. The general rule is that "[a] purchaser entering into and holding possession of land under an executory contract of purchase or bond for title does so in subordination to, and not adverse to, the rights of the vendor or of those holding under the vendor." 2 C.J.S. *Adverse Possession* § 138, Westlaw (database updated May 2024); *see also* Tiffany, *supra*, § 513 ("The possession of the vendee of land under an executory contract of sale is presumed to be in subordination to the rights of his vendor so long as the purchase price has not been paid or the contract is otherwise unperformed on his part.").

- 16 -

Tenn. Code Ann. § 66-26-102 (providing that a registered instrument "shall be notice to all the world from the time [it is] noted for registration . . . and shall take effect from such time"); *id.* § 66-26-103 ("Any instruments not so registered, or noted for registration, shall be null and void as to existing or subsequent creditors of, or bona fide purchasers from, the makers without notice."). All that an owner needs to do to perfect his title and make it "good as to all the world" is register the deed. *McCorkle*, 80 S.W. at 837.

To the extent that *City of Knoxville* is inconsistent with our earlier precedents requiring a conflict of title or a controversy regarding possession, we overrule that decision. Plaintiffs assert that *City of Knoxville* established a "rule of property" that is more difficult to overrule than an ordinary precedent. "The doctrine of Rule of Property is but a subdivision of that of *stare decisis*." *City of Memphis v. Overton*, 392 S.W.2d 98, 101 (Tenn. 1965). Such a rule "exists only when the points in judgment arising in a prior decision are the same as those in subsequent adjudications." *Id.*; *see also Rule of Property*, Black's Law Dictionary 1598 (11th ed. 2019) ("An established legal principle arising from one or more judicial precedents relating to title to real, personal, or intellectual property; more loosely, such a principle relating not necessarily to title but affecting property rights in some way."). When such "[t]echnical rules of law . . . become rules of property by a long train of judicial precedents," they "are as binding on the court as statutory laws." *McKinney v. Stacks*, 53 Tenn. (6 Heisk.) 284, 295 (1871).

Calling something a "rule of property" does not make it so. It is the Court's job to "decide whether the rule governing the property issue at stake is sufficiently settled to be entitled the weight accorded a true rule of property under the doctrine." Bryan A. Garner et al., *The Law of Judicial Precedent* 423 (2016). We do not think the adverse possession holding in *City of Knoxville* rises to that level. As discussed, and as evidenced by the Court of Appeals' decision in *Milledgeville*, that holding does not reflect a settled understanding of the law. To the contrary, it constitutes a departure from a long line of precedents holding that adversity requires a conflict of title or a controversy regarding the right of possession. *City of Knoxville* is therefore entitled to no greater weight in our stare decisis analysis than any other incorrect decision. *See Frazier v. State*, 495 S.W.3d 246, 253 (Tenn. 2016) (explaining that "the doctrine of stare decisis does not compel this Court to maintain erroneous, 'unworkable,' or 'badly reasoned' precedent" (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991))).

C.

Finally, we apply our understanding of the adversity requirement to the facts of this case. To determine whether the adversity requirement was satisfied here, we must assess whether Mr. Eads adversely held the property during the claimed periods of adverse

possession—from February 1991 to February 2011 for common-law adverse possession and from February 1991 to February 1998 for statutory adverse possession.

Mr. Eads did not adversely possess the property against Mr. Whiteaker during the claimed period of adverse possession because the deed conveying the property from Mr. Whiteaker to Brake-Tech was effective between Mr. Whiteaker and Mr. Eads. Recall that under Tennessee Code Annotated section 66-26-101, a deed "shall have effect between the parties to the same, and their heirs and representatives, without registration." By the time the installment payments were complete and the deed to 99 Hermitage Avenue was transferred to Brake-Tech, Brake-Tech had been administratively dissolved, and its assets passed to Mr. Eads as the corporation's sole shareholder. As counsel for plaintiffs conceded at oral argument, the deed was thus effective between Mr. Whiteaker and Mr. Eads, notwithstanding the latter's failure to register it. *See McCorkle*, 80 S.W. at 836 ("As between the parties, registration of the deed was unimportant. The legal title passed . . . by the execution of the deed; and though the deed was never registered, yet between him and his vendee the divestiture of title was as complete as if registration had taken place."). Accordingly, there could be no conflict of title between Mr. Whiteaker and Mr. Eads during the period of claimed adverse possession, which did not begin until after the deed was transferred.

Nor did Mr. Eads adversely possess the property against SPCP or 99 Hermitage, LLC, throughout the claimed periods of adverse possession. We agree with plaintiffs that the unregistered deed was ineffective against SPCP and Hermitage. *See* Tenn. Code Ann. § 66-26-101 (providing that an unregistered deed shall not have effect as to persons "not having actual notice" of it); *id.* § 66-26-103 (explaining that unregistered deeds are "null and void as to existing or subsequent creditors of, or bona fide purchasers from, the makers without notice"). But that is of little help to plaintiffs because SPCP and Hermitage did not acquire any interest in the property until well after Mr. Eads's claimed periods of adverse possession began. SPCP obtained a judgment lien against the property in September 2009 and brought an action to enforce the lien and compel the sale of the property less than seven years later, in June 2016. And Hermitage did not purchase the property until 2017. Thus, even assuming that Mr. Eads's possession of the property was adverse to SPCP or Hermitage, it was not adverse for long enough to satisfy the requirements of either statutory or common-law adverse possession.

Plaintiffs argue that Mr. Eads possessed the property adversely to Mr. Whiteaker because Mr. Whiteaker, as record owner of the property, was the "true owner" from the perspective of everyone other than the parties to the unregistered deed. But this argument ignores that the deed was effective between the parties to the deed. As between Mr. Whiteaker and Mr. Eads, there was no conflict of title or controversy regarding the right of possession. Legal title transferred to Brake-Tech—and then to Mr. Eads given Brake-

Tech's administrative dissolution—when Mr. Whiteaker transferred the deed following completion of the installment payments.

Plaintiffs also make much of the fact the deed was conveyed to Brake-Tech, not to Mr. or Mrs. Eads individually, and contend that Mr. Eads thus "cannot be characterized as the true owner solely on the basis of the [d]eed." Yet plaintiffs acknowledge that Brake-Tech had been administratively dissolved by the time the Eadses completed the installment payments and received the deed and that, upon dissolution, the assets of the corporation passed to Mr. Eads as Brake-Tech's sole shareholder. There is no real dispute that Mr. Eads gained legal title to the property when he received the deed from Mr. Whiteaker after completing the installment payments.

D.

The dissent disagrees with our conclusion that Mr. Eads could not satisfy the adversity requirement for adverse possession. The dissent contends that neither Mr. Eads nor Mr. Whiteaker can be considered the "true owner" of the property because both parties retained interests in the property. In the dissent's view, "Mr. Eads's possession of the property conflicted with the record title interest Mr. Whiteaker retained."

Respectfully, this argument ignores that there could be no conflict of title between Mr. Eads and Mr. Whiteaker given the deed's effectiveness between them. *See* Tenn. Code Ann. § 66-26-101. As explained above, Mr. Whiteaker retained no interest in the property that he could assert against Mr. Eads; he therefore had no cause of action against Mr. Eads that could trigger the start of any adverse possession period. *Cf.* 2 C.J.S. Adverse Possession § 125, Westlaw (database updated May 2024) ("[T]he viewpoint has been expressed that in the case of an executed conveyance of legal title, there is neither possession nor right of seisin left in the grantor, and therefore, no objective upon which an adverse possession can operate as respects the grantor.")

The dissent cites a number of treatises and other secondary authorities for the proposition that a grantee may possess property adversely to the grantor. We agree that a grantee's possession may *sometimes* be adverse to the grantor. For example, a grantee's possession could be adverse to the grantor when the conveyance is defective and fails to validly transfer title from the grantor to the grantee. *See, e.g.*, 3 Am. Jur. 2d *Adverse Possession* § 179, Westlaw (database updated May 2024) (noting that the "practical utility" of the rule that "possession of a grantee is presumptively adverse to the grantor" is that "a grantee may acquire title by adverse possession against the grantor *even though the conveyance under which the grantee holds is defective*" (emphasis added)). Nothing in our opinion undermines that principle. Nor does our opinion call into question precedents holding that an individual may rely on an unregistered deed as assurance or color of title.

*See, e.g.*, *Stewart's Lessee v. Harris*, 32 Tenn. (2 Swan) 656, 657–58 (1853). For example, if a grantee neglected to record the deed but the conveyance between the grantor and grantee was invalid for another reason, then the unregistered deed would be color of title—that is, "evidence that appears to establish title *but does not in fact do so*." *Color of Title*, Black's Law Dictionary 333 (11th ed. 2019) (emphasis added). But the proposition that a grantee may *in some circumstances* adversely possess property against the grantor does not establish that adversity exists in the unique circumstances of this case.[10]

The dissent also cites a number of cases that purportedly "allowed parties with an unrecorded deed in possession to claim title by adverse possession or defensive statutory adverse possession." But those cases discuss adverse possession only in dicta or without addressing whether the adversity requirement was satisfied. *See, e.g.*, *Twinton Props. P'ship v. Nidiffer*, 44 B.R. 426, 432–33 (Bankr. M.D. Tenn. 1984) (discussing adverse possession only after concluding that "Twinton ha[d] proven a satisfactory chain of title to the land" and failing to address the adversity requirement); *Smith v. Cross*, 140 S.W. 1060, 1065 (Tenn. 1911) (asserting that an unregistered deed may support defensive statutory adverse possession but holding that there was no evidence such a deed existed).[11]

We acknowledge that some courts have reached a conclusion at odds with ours in cases involving similar facts. *See, e.g.*, *Sessoms v. McDonald*, 75 S.E.2d 904, 907 (N.C. 1953); *Winters v. Powell*, 61 So. 96, 99 (Ala. 1912). Yet those cases have been subject to criticism. *See* Tiffany, *supra*, § 512; *Recording and Registry Laws – Effect of Recording*, 26 Harv. L. Rev. 762 (1913). As one commentator explained, the better view is that when one "obtains a conveyance from the true owner, his possession should thereafter . . . be regarded as based on the conveyance, so that, if he fails to record it, a subsequent bona fide purchaser will acquire a superior title." Tiffany, *supra*, § 511. That is because, "[h]aving

---

[10] Citing *Phelps v. Pecos Valley Southern Railway Co.*, 182 S.W. 1156 (Tex. Civ. App. 1916), the dissent suggests that our opinion could cast doubt on cases holding that an unrecorded deed is "sufficient to establish color of title for adverse possession." But in *Phelps*, the party claiming adverse possession held the property under a recorded but ineffective deed; the unrecorded deed had occurred earlier in his chain of title. *Id.* at 1156. Moreover, a conflict of title existed from the outset of that party's possession because a common grantor had conveyed the property to two different grantees. *Id.* Our opinion does not prevent a grantee from relying on an unrecorded deed as color of title in that situation. The dissent's concern that our opinion "could have ramifications elsewhere in Tennessee property law" is unfounded and ignores the limited nature of our holding.

[11] The facts in *Gordon's Lessee v. Parsons' Executors* are not entirely clear. 1 S.C.L. 37 (S.C. 1786). The grantor initially conveyed the property in 1766. *Id.* at 35. The grantee took possession of the property that year but failed to record the deed. *Id.* The grantor then "made another conveyance of the same land" to a second grantee "several years" later. *Id.* The court held that the initial grantee had established title by adverse possession by proving "an uninterrupted possession" for ten years, but it is unclear whether there was a conflict of title between the initial grantee and second grantee throughout that ten-year period. *Id.* at 37.

obtained a deed from the rightful owner, his possession ceases to be wrongful, and the statute runs only in favor of a wrongful possession." *Id.* Another commentator noted that *Winters v. Powell* "would seem to be contrary to the general effect of recording statutes as construed by courts" and endorsed the view that possession of a grantee holding pursuant to an unrecorded deed "could not be adverse." *Recording and Registry Laws*, *supra*, at 762. And even one commentator who agreed with the result in *Winters* acknowledged that some viewed that case as a "novel and perhaps unwarranted application" of the adverse possession doctrine. W.W. Ferrier, Jr., *The Recording Acts and Titles by Adverse Possession and Prescription*, 14 Calif. L. Rev. 287, 289 (1926). In any event, those cases do not bind us. And we decline to follow them because they are inconsistent with Tennessee's jurisprudence regarding the adversity requirement.

Contrary to the dissent's assertion, our opinion does not "rejigger" the adversity analysis "to base it on the *priority* between the parties." We hold only that, when a grantor validly conveys legal title to a grantee but the grantee fails to record the deed, the grantee's possession of the property is not adverse *to the grantor*. Despite the grantee's failure to record, the deed is effective between the grantor and grantee. Our opinion does not preclude the holder of an unrecorded deed from establishing adversity against a party *other than the grantor*, such as another grantee, even when that party would otherwise have priority. The problem here is that any adversity as to other parties was not present long enough to satisfy the requisite time periods for statutory or common-law adverse possession.

## CONCLUSION

We hold that adversity, for purposes of adverse possession, requires a conflict of title or controversy regarding the right of possession. We further hold that, when title is validly conveyed from the grantor to the grantee but the grantee fails to register the deed, the grantee's possession of the property is not adverse to the grantor. Because we conclude that Mr. Eads did not satisfy the requirements for statutory or common-law adverse possession, we reverse the judgment of the Court of Appeals, reinstate the chancery court's judgment, and tax the costs of this appeal to plaintiffs.

_____

SARAH K. CAMPBELL, JUSTICE